## The Mayor, Aldermen, and Commonalty of the City of New York, plaintiffs v. George Miln.

:n February, 1824, the legislature of New York passed "an act concerning passengers in vessels arriving in the port of New York." By one of the provisions of the law, the master of every vessel arriving in New York from any foreign port, or from a port of any of the states of the United States, other than New York, is required, under certain penalties prescribed in the law, within twenty-four hours after his arrival, to make a report in writing, containing the names, ages, and last legal settlement of every person who shall have been on board the vessel commanded by him during the voyage; and if any of the passengers shall have gone on board any other vessel, or shall, during the voyage, have been landed at any place with a view to proceed to New York, the same shall be stated in the report. The corporation of the city of New York instituted an action of debt under this law against the master of the ship Emily, for the recovery of certain penalties imposed by this act; and the declaration alleged, that the Emily, of which William Thompson was the master, arrived in New York, in August, 1829, from a country out of the United States, and that one hundred passengers were brought in the ship, in the voyage, and that the master did not make the report required by the statute referred to. The defendant demurred to the declaration, and the judges of the circuit court being divided in opinion on the following point, 't was certified to the Supreme Court. "That the act of the legislature of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the port of New York and foreign ports, and is unconstitutional and void." The Supreme Court directed it to be certified to the circuit court of New York, that so much of the section of the act of the legislature of New York as applies to the breaches assigned in the declaration, does not assume to regulate commerce between the port of New York and foreign ports; and that so much of the said act is constitutional.

The act of the legislature of New York is not a regulation of commerce, but of police; and, being so, it was passed in the exercise of a power which rightfully belonged to the state. The state of New York possessed the power to pass this law, before the adoption of the constitution of the United States. The law was intended to prevent the state being burthened with an influx of foreigners, and to prevent their becoming paupers, and who would be chargeable as such. The end and means here used, are within the competency of the states, since a portion of their powers were surrendered to the federal government.

The case of Gibbons v. Ogden, 9 Wheaton, 203, and Brown v. The State of Maryland, 12 Wheaton, 419, cited. The section of the act of the legislature of New York on which this action is brought, falls within the limits of the powers of state laws drawn by the Court in the case of Gibbons v. Ogden; and there is no aspect in which the powers exercised by it transcends these limits. There is not the least likeness between the case of Brown v. The State of Maryland, and the case before the Court.

In the case of Brown v. The State of Maryland, this Court did indeed extend the power to regulate commerce, so as to protect the goods imported from a state tax,

[City of New York v. Miln.]

after they were landed, and were yet in bulk, because they were the subjects of commerce; and because, as the power to regulate commerce, under which the importation was made, implied a right to sell whilst the bales or packages were in their original form. This does not apply to persons. They are not the subjects of commerce.

There is a portion of the reasoning of the Court, in the cases of Ogden v. Saunders, and Brown v. The State of Maryland, which would justify measures on the part of the state, not only approaching the line which separates regulations of commerce, from those of police, but even those which are almost identical with the former class, if adopted in the exercise of their acknowledged powers. 9 Wheat. 204, 209.

From the language of the Court in these cases it appears, that whilst a state is acting within the scope of its legitimate power, as to the end to be attained, it may use whatever means, being appropriate to the end, it may think fit; although they may be the same or so nearly the same, as scarcely to be distinguished from those adopted by congress acting under a different power: subject, only, the Court say, to this limitation, that in the event of collision, the law of the state must yield to the law of congress. The Court must be understood, of course, as meaning that the law of congress is passed upon a subject within the sphere of its power. Even then, if the section of the act of New York under consideration in this case, would be considered as partaking of the nature of a commercial regulation, the principle laid down in Gibbons v. Ogden would save it from condemnation, if no such collision existed. There is no collision between the provisions of the section of the law of New York, on which this suit has been brought, and the provisions of the laws of the United States of 1799, or 1819, relating to passengers.

It is obvious that the passengers laws of the United States, only affect, through the power over navigation, the passengers whilst on their voyage, and until they shall have landed: after that, and when they shall have ceased to have any connexion with the ship, and when, therefore, they have ceased to be passengers, the acts of congress applying to them as such, and only professing to legislate in relation to them as such, have then performed their office; and can, with no propriety of language, be said to come into conflict with the law of a state, whose operation only begins where that of the laws of congress end; whose operation is not even on the same subject: because, although the person on whom it operates is the same, yet, having ceased to be a passenger, he no longer stands in the only relation in which the laws of congress either professed or intended to act upon him.

A state has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation; when that jurisdiction is not surrendered or restrained by the constitution of the United States.

It is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness, and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise, are not surrendered or restrained by the constitution of the United States.

All those powers which relate to merely municipal legislation, or which may more properly be called internal police, are not surrendered or restrained; and, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.

It is, at all times, difficult to define any subject with precision and accuracy. If this be so in general, it is emphatically so in relation to a subject so diversified and va-

rious as that under the consideration of the Court in this case. If the Court were to attempt it, they would say, that every law came within the description of a regulation of police, which concerned the welfare of the whole people of a state, or any individual within it; whether it related to their rights or their duties; whether it respected them as men, or as citizens of the state in their public or private relations; whether it related to the rights of persons, or of property, of the whole people of a state or of any individual within it; and whose operation was within the territorial limits of the state, and upon the persons and things within its jurisdiction. An example of the application of these principles, is the right of a state to punish persons who commit offences against its criminal laws, within its territory.

Persons are not the subjects of commerce; and not being imported goods, they do not fall within the reasoning founded upon the construction of a power given to congress to regulate commerce, and the prohibition of the states from imposing a duty on imported goods.

ON a certificate of division in opinion of the judges of the circuit court of the United States for the southern district of New York.

In the superior court of the city of New York, the plaintiffs instituted an action of debt for the recovery of 15,000 dollars, the amount of certain penalties alleged to have been incurred by the defendant, under the provisions of an act of the legislature of the state of New York, passed February 11th, 1824, entitled "an act concerning passengers in vessels coming to the port of New York." The defendant, being an alien, removed the cause into the circuit court of the United States, and the pleadings in the case were carried on to issue in that court.

The act of the legislature of New York provides, in the first section, that the master of any ship or vessel arriving in the port of New York from any country out of the United States, or from any other state of the United States, shall, within twenty-four hours after his arrival, make a report, in writing, to the mayor of the city of New York, or, in his absence, to the recorder, on oath or affirmation, of the name, place of birth, and last legal settlement, age and occupation, of every person brought as a passenger in the ship or vessel, or on board of her, on her last voyage, from any country out of the United States, or from any of the United States, into the port of New York, or into any of the United States, and of all persons landed from the ship, during the voyage at any place, or put on board, or suffered to go on board any other vessel, with intention of proceeding to the city of New York; under a penalty, on the master and commander, the owner, consignee or consignees, of seventy-five dollars, for each passenger not

[City of New York v. Miln.]

reported, and for every person whose name, place of birth, last legal settlement, age, and occupation, shall be falsely reported.

The second section authorizes the mayor, &c., to require from every master of such vessel that he be bound with sureties in such sum as the mayor, &c., shall think proper, in a sum not to exceed 300 dollars, for every passenger, to indemnify and save harmless the mayor, &c., of the city of New York, and the overseers of the poor of the city from all expenses of the maintenance of such person, or of the child or children of such person, born after such importation; in case such person, child or children, shall become chargeable to the city within two years: and if for three days after arrival, the master of the vessel shall neglect to give such security, the master of the vessel, and the owners, shall severally and respectively, be liable to a penalty of 500 dollars, for each and every person not a citizen of the United States, for whom the mayor or recorder shall determine that bonds should have been given.

The third section enacts, that whenever any person brought in such vessel, not being a citizen of the United States, shall, by the mayor, &c., be deemed liable to become chargeable on the city, the master of the vessel shall, on an order of the mayor, &c., remove such person, without delay, to the place of his last settlement; and in default, shall incur all the expenses attending the removal of such person and of his maintenance.

The fourth section provides that every person, not being a citizen of the United States, entering the city of New York with an intention of residing therein, shall, within twenty-four hours, make a report of himself to the mayor, stating his age, occupation, and the name of the ship or vessel in which he arrived, the place where he landed, and the name of the commander of the vessel.

The sixth section subjects the ship or vessel in which such passengers shall have arrived, to the penalties imposed by the former sections, for any neglect of the provisions of the law by the master or owner; and authorizes proceedings by attachment against the ship or vessel for the same, in the courts of New York.

The declaration set forth the several provisions of the act, and alleged breaches of the same; claiming that the amount of the penalties stated had become due in consequence of such breaches.

To this declaration the defendant entered a demurrer, and the plaintiffs joined in the same.

The following point was presented to the court on the part of the

[City of New York v. Miln.]

defendant: "That the act of the legislature of the state of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the port of New York and foreign ports, and is unconstitutional and void."

Upon this question the opinion of the judges being opposed, the same was certified to this Court, at the request of the plaintiffs.

The case was argued at a former term of this Court, and the justices of the Court being divided in opinion, a re-argument was directed.

It was again argued by Mr. Blount and Mr. Ogden, for the plaintiffs; and by Mr. White and Mr. Jones, for the defendant.

Mr. Blount, for the plaintiff, contended that the law in question was constitutional. The case he said was not without difficulty; indeed, the very hesitation of a court constituted as this was, admonished him of the doubts and difficulties attending the solution of the question.

The law was one peculiar to this country, and it grew out of circumstances also peculiar to this country. The emigration to the United States since the American revolution, was unprecedented in history, not merely in numbers, but in its character. It was not a military colonization, like the Greek and Roman colonies; nor was it mercantile, like the East India and American colonies of modern Europe. Neither did it resemble the emigration of the Moors from Spain, or the Huguenots from France. It was a constant and steady migration of civilized Europeans to an independent country, controlled by a civilized people. This migration was peculiar to the United States, and we cannot find legal analogies in other countries. That migration has now reached the amount of sixty thousand five hundred yearly, into the port of New York alone.

It was obvious that laws were needed to regulate such a migration; and the Atlantic states, generally, have passed such laws: and the law in question, is that of New York, providing that masters of vessels bringing passengers to that port, who have no legal settlement in the state, shall give bonds to the city to indemnify it for three years from all charges on account of their maintenance. It also provides for a report to the mayor of the names, &c. of the passengers, and inflicts a penalty for a violation of the law.

At the previous argument, the defendant contended that this was

a regulation of commerce, and that the power to regulate commerce was exclusively vested in congress. Hence this law, passed by a state, was unconstitutional.

We do not admit this law to be a regulation of commerce; but conceding, for the sake of the argument it to be so, it does not follow. that it is unconstitutional.

Because congress has the power to regulate commerce, it is not a consequence that it is an exclusive power.

Powers granted to congress are exclusive only.

1st. When granted in terms *expressly exclusive.*

2d. When the states are *prohibited* from exercising it.

3d. When exclusive in its nature.

This power clearly does not fall under the first nor second class.

Does it under the third class?

The counsel contended that a legislative power is exclusive in its nature, only when its *existence* in another body would be repugnant to, and incompatible with its exercise by congress.

Not that its exercise by a state legislature would be incompatible with its exercise by congress. That is a conflict between concurrent or co-ordinate powers; and where that takes place, we concede the federal power is supreme.

A power exclusive in its nature, must be such that the states can pass no law upon the subject without violating the constitution. Federalist, No. 32; 5 Wheat. 49; 1 Story on Cons. Law, 432.

Concurrent powers are of two classes.

1st. Where any federal legislation covers the whole ground, and exhausts the subject; as fixing the standard of weights and measures. Here, after congress has legislated, the power of the states is at an end.

2d. Where the power may be exercised in different modes, or on different subjects; or where the object admits of various independent regulations operating together.

In these cases the concurrent laws are all in force, and the state law is void only so far it conflicts with the law of congress.

The 2d section of 6th article of the constitution, providing that the laws of congress made pursuant to the constitution shall be the supreme law of the land, proves that this species of concurrent legislation was contemplated. This Court has sanctioned this view of the subject, 4 Wheat. 122. 196; 5 Ib. 49; 9 Ib. 200.

In the case of Saunders v. Ogden, it was decided that a bankrupt

law passed by a state was valid, until it conflicted with federal legislation.

The counsel, Mr. Blount, contended, that the case of Gibbons v. Ogden, did not touch the case before the Court.

1st. Because, there the power to regulate commerce was regarded as exclusive only so far as it regulated the commerce of the United States as a whole.

2d. Because, there the question decided by the Court was whether a state could regulate commerce, while congress was regulating it. 9 Wheat. 200.

3d. Because it was expressly said in that case by the Court, that it never was intended to deny to the states all legislation, which might affect commerce. Ib. 204.

That decision therefore does not touch the point, and the Court is now called upon to go farther, and declare all state laws affecting commerce void.

This is the extent of defendant's doctrine.

There is here no conflict of concurrent laws.

Congress has passed no law conflicting with this law.

The acts of 1779, March 2d, and of 1819, March 2, cited by the defendant's counsel in the former argument, are for different purposes.

The first is a revenue law, and the provisions relating to passengers are confined entirely to the entering and landing of baggage, and they are intended to prevent smuggling.

The second is intended to prevent the cupidity of masters and owners from crowding their ships with passengers, and to compel them to provide a sufficient quantity of water and provisions.

The treaties with Brazil, and Austria, and Prussia, are equally inapplicable. They merely secure freedom of commerce and intercourse to the subjects of these countries, they conforming to the laws of this country. This law was then in existence, and the exception provides for the execution of all such laws.

Besides, the defendant here does not appear to be a subject of either of those powers; and of course cannot claim any thing on account of those treaties, even if they were applicable to the case.

We do not deny that in regulating commerce the power of congress is supreme, and it may be regulated either under that power, or under the treaty making power. Until that be done, and the conflict occur, the state law is valid. Such are the doctrines of this

[City of New York v. Miln.]

Court, and of the ablest jurists. 1 Story, Cons. Law, 433. "Congress may make that a regulation of commerce, which a state may employ as a guard of its internal policy, or to promote its own peculiar interests."

"If the power to regulate commerce be exclusive, still the legislation of a state acting on subjects within the reach of other powers, besides that of regulating commerce, would be constitutional." 2 Story, Cons. Law, 517.

In order to decide the cause for the defendant, the Court must come to the conclusion that the power regulating commerce is so exclusive that all states laws affecting or regulating commerce are necessarily void, even where no conflict exists.

This is beyond any former decision, and we think the Court will not adopt such a conclusion.

1st. Because it is a case where power is claimed by implication, and it is not sufficient to show a possibility of inconvenience. All such cases too are decided upon their own grounds.

2d. It is a question of power, and the Court will require most convincing arguments before denying it to the states.

3d. Such a construction is not necessary to reconcile former decisions.

4th. The regulation of passengers was productive of no conflicting legislation under the old confederation. It was not the evil to be remedied, when the power to regulate commerce was given to congress. Supremacy of federal law is a sufficient remedy, and the Court will not imply power farther than necessary.

5th. This construction would throw upon congress a mass of legislation which it could not perform; and the tendency to alienation from the federal government would be increased by its incompetency to perform its duties.

Among these laws are the laws regulating the discharge of ballast; the harbour regulations; the pilot laws of the states; the health laws; the laws of police as to the conduct of crews of vessels while in port; and a class of laws peculiar to the southern states, prohibiting traffic with slaves, and prohibiting masters of vessels from bringing people of colour in their vessels. Such is the mass of legislation which must be abrogated by such a decision.

But when we look at the course of commerce with foreign countries, at the commencement, the progress, and the conclusion of a voyage; it is difficult to estimate the extent to which such a conclu-

sion must lead the Court. The merchandise that is sent abroad is purchased in the interior, and bills of exchange on the northern cities, and on Europe, given for it. The merchandise that is brought home on the return voyage, is often kept in the original package, and is transported from state to state, with benefit of drawback, until it is again shipped for a foreign market. How much of this falls within the power to regulate commerce with foreign states; and if exclusive, how much must be withdrawn from state legislation?

There is no criterion furnished by referring to the place where the business is transacted, and by declaring that all transacted within the country falls within state jurisdiction, and the residue within federal jurisdiction. The shipping of sailors is within the country, and that is regulated by congress; and so is their discharge and enforcement of the contract. On the other hand, pilotage, a contract commenced upon the ocean, is regulated by state laws.

Again, if the power to regulate commerce with foreign states be exclusive, that of regulating commerce between the states is exclusive also. Both powers are conferred in the same terms, and in the same clause.

Apply the construction contended for by the defendant, and the legislative power of the states is at an end. They become mere municipal corporations; and all legislation relative to commerce, the great business of the country, becomes exclusively vested in congress. Under this head of the argument, therefore, we conclude that, conceding the passenger law to be a commercial regulation, the states have a power concurrent with congress to legislate, but subject to the controlling power of congress.

2d. The law is not a commercial regulation in the sense contemplated in the constitution; but a police regulation. It is a part of the system of poor laws, and intended to prevent the introduction of foreign paupers. This power of determining how and when strangers are to be admitted, is inherent in all communities. 2 Ruth. Inst. 476;

Fathers of families, officers of colleges, and the authorities of walled cities, all have this power as an incident of police. In states it is a high sovereign power. It belonged to the states before the adoption of the federal constitution. It is no where relinquished; nor can it be with safety. It is essential to the very existence of some, and to the prosperity and tranquillity of all. That it was not intended to relinquish it, we infer:

1st. Because it was not prohibited to the states.

2d. Because it is not expressly granted to congress, but only as an incident to other powers; as the war power, the treaty making power, or the power to regulate commerce. It may also be used by the states as a police regulation, as part of the system of poor laws, or to promote internal tranquillity. But because it is an incident to some of the federal powers, it can never be pretended that it is necessarily prohibited to the states.

3d. Because the sec. 9, art. 1, of constitution concedes, in so many words, that the states have this power, and imposes a restriction upon the concurrent power of congress, until 1808.

It declares that " the migration or importation of such persons as any of the states, now existing, shall think proper to admit, shall not be prohibited by congress prior to 1808." What is the meaning of the words, " the states shall think proper to admit?" States can only think through their laws. Legislation is the thought of states. The very phrase shows that the states reserved the power to admit, or prohibit; and consequently to regulate the admission. The power of congress is suspended until 1808; but the power of the states remains as before the constitution. Did the arrival of the year 1808 extinguish that power in the states? Such a construction will hardly be contended for. After that year, congress is enabled to exercise one of the incidents to its powers, which before it was prohibited to do. It must exercise it, however, as a concurrent power, and supreme when conflicting. Supposing congress had not chosen to pass any laws on this subject after 1808, would the state laws necessarily be abrogated by the arrival of that year? Would the laws passed by the states abolishing the slave trade before 1808, have been repealed? Such must be the conclusion, if the power be exclusive in its own nature.

Again, if the power to pass laws regulating the admission of passengers from Europe, fall under the power of regulating foreign commerce, that of regulating the arrival of passengers by land, falls under the power of regulating commerce between the states. If the one be exclusive, the other is exclusive; and all vagrant laws, all poor laws, and police regulations, become, at once, solely of federal jurisdiction. The laws of the southern states in relation to the intercourse and traffic with slaves, and to the introduction of coloured persons into those states, also become the subjects of federal jurisdiction, and the state laws are abrogated. Here the counsel examined

the character of those laws; and.concluded by observing, that although he must not be understood as approving of the peculiar provisions o. those laws, still it was obvious that some legislation was necessary in reference to that population, and that the states clearly had the power to pass such laws.

The poor laws, providing for sending back paupers to their place of settlement, in the adjoining counties of a bordering state, will share the same fate; and congress will have to provide a national system of poor laws.

In our view, the law in question is altogether a police regulation: as much so as laws prohibiting entrance into a walled city after dark; laws prohibiting masters from bringing convicts into the state; or the laws prohibiting free negroes from being introduced among slaves.

The history of this law also throws some light upon its constitutionality. The federal constitution was adopted by nine states—the constitutional number in 1788; and on the 13th of September, of that year, a resolution was adopted by the old continental congress, announcing that fact; directing presidential electors to be chosen, and fixing the 4th of March, 1789, for the commencement of the new government. Three days afterwards, on the 16th of September, the same body unanimously adopted a resolution, recommending to the several states to pass proper laws for preventing the transportation of convicted malefactors from foreign countries into the United States. When this resolution, so directly bearing upon the point in question, was adopted, there were present, Dana, the profound and enlightened jurist and framer of the government of the North West Territory; Gilman, Williamson, Fox, and Baldwin, members of the convention which formed the federal constitution; Hamilton and Madison, also members of that convention, and the eloquent expounders of that instrument.

Jay, the third expounder, and the first Chief Justice of this Court, was the secretary of foreign affairs, and, no doubt, recommended the passage of this law. If any contemporaneous authority is entitled to respect, here was one of the highest character. A resolution, at the very moment the new government was going into operation, recommending to the states to pass these laws, as peculiarly within their province.

Under that resolution, the states acted. November 13th, 1788, Virginia passed a law forbidding masters of vessels from landing convicts, under a penalty of fifty pounds. South Carolina and Georgia

[City of New York v. Miln.]

passed passenger laws the same year. New Hampshire passed a passenger law in 1791. Massachusetts, in 1794. The New York passenger law was first passed 7th March, 1788; and has been re-enacted, with some modifications, at each subsequent revision of her laws.

The resolution of congress extends to the very point in dispute. If the admission of convicts may be prohibited, the mode of bringing passengers may be regulated. The same rule is applicable to the admission of paupers, as to convicts. This will not be denied.

The defendant's counsel asserted, in the former argument, that the laws of 1799, and 1819, have regulated this intercourse.

We deny it. Those laws were for other objects. It is not true that a person conforming to those laws, may import passengers in spite of state laws; because the laws of 1799, and 1819, were all the regulations that congress thought necessary.

A state law is not necessarily void, because persons violating it, are acting in conformity with an act of congress. Even in such cases, states acting under other powers may control individuals acting in conformity with laws of the federal government.

A man may obtain a patent for making and vending a medicine, and a state may prohibit its sale. He may obtain a copy-right for publishing a book, and the state may punish him because it is libellous. A merchant may import gunpowder, or Chinese crackers, pursuant to the revenue laws; and the state of New York may prohibit the former from being landed, and the other from being sold in the city. He may also bring passengers, pursuant to the above-mentioned laws; and the legislature may compel him to give security that they will not become a public charge.

We therefore contend, that the power to regulate commerce is not exclusively in congress, but concurrent in the states; and that state laws are valid, unless conflicting, and only void where repugnant.

2d. That the law in question is merely a police regulation, and not a regulation of commerce, in the sense of the constitution.

3d. That the power over this species of intercourse is vested in congress only; is incident to other powers, and not in any sense exclusive.

4th. That the law of New York is not repugnant to any existing treaties or laws of congress, and is therefore valid.

Vol. XI.—P

[City of New York v. Miln.]

Such a conclusion produces no inconvenience; but, on the contrary, promotes a public good. It vests power where there is an inducement to exercise it. In congress, there is no such inducement. The west seeks to encourage emigration; and it is but of little importance to them, how many of the crowd are left as a burden upon the city of New York. There is, therefore, a hostile principle in congress to regulating this local evil. A construction that would vest this power exclusively there, would be contrary to the general design of our government; which is to entrust the care of local interests to local authorities; and only to congress, when necessary to the national welfare.

We trust that this Court will not make a decision that, by absorbing so large a portion of state legislation in a power to regulate commerce, deemed exclusive by inference, will tend to weaken the authority of this Court, and shake the stability of the government; but that, according to the design of the constitution, in conformity with its history, and in accordance with its own decisions and principles of interpretation, that it will decide that the states had power to pass such laws until 1808, without control; and after 1808, they had a concurrent power, subject to the control of congress; and that, until conflicting with federal laws, the law is valid and in force.

*Quarantine Laws.* Maine, Act 10th March, 1821; New Hampshire, 3d February, 1789; Massachusetts, Rev. Stat. 1834, 20th June, 1799; Rhode Island, June 22d, 1797, and Rev. Stat. 1822; Connecticut, Rev. Stat. 1835. New York, 14th April, 1820; New Jersey, 3d February, 1812. Pennsylvania, 29th January, 1818, and 2d April, 1821; Delaware, 24th January, 1797, and 1800; Maryland, November, 1793; Virginia, 26th December, 1792; North Carolina, Act 1794, 1802, and 1817; South Carolina, 19th December, 1795, 21st July, 1800, and December, 1809; Georgia, 23d December, 1833; Louisiana, 19th February, 1825; Alabama, 21st December, 1823.

*Passenger Laws.* Maine, 24th February, 1821, and 28th February, 1835; New Hampshire, 18th June, 1807, 15th February, 1791, 14th June, 1820; Massachusetts, February, 1794, and Rev. Stat. 1834; Rhode Island, Revised Laws, 1822; Connecticut, October, 1788, and Rev. Laws, 1835; New York, 11th February, 1824; New Jersey, 28th January, 1797, 10th February, 1819; Pennsylvania, 29th January, 1818, 1st February, 1818; Delaware, 24th January, 1797, 12th February, 1829; Maryland, November, 1809, 22d March, 1833, and 17th February, 1835; Virginia, 13th November, 1788,

[City of New York v. Miln.]

26th December, 1792, and 11th March, 1833; North Carolina, 1792, and 1832, 1825, and 1830; South Carolina, 1788, and 19th December, 1835, Louisiana, 16th March, 1818, and 26th March, 1835.

*Pilot Laws.* Maine, 24th February, and 10th March, 1821; New Hampshire, 18th June, 1805; Massachusetts, Rev. Stat. 1834; Pennsylvania, 2d April, 1804, 20th March, 1811, and 29th March, 1803; Delaware, February 5th, 1819, and 31st January, 1825; Maryland, November, 1803, 1818, and 24th February, 1824; Virginia, 10th February, 1819, 26th February, 1821, 27th January, 1825; North Carolina, 1790, 1797, 1805, 1812, 1823, and 1831; South Carolina, 17th August, 1807, July 31st, 1815; Georgia, 23d December, 1835, 23d December, 1830; Alabama, 23d December, 1823, and 13th January, 1828; Louisiana, 31st March, 1805; 7th June, 1806, and 1st March, 1826.

*Wreck Laws.* Maine, 27th February, 1821; Massachusetts, Rev. Stat. 1824; Connecticut, Rev. Laws, 1835; Tit. 117; New York, 1 Rev. Stat. 690; New Jersey, Rev. Laws, 716, and 9th March, 1836; Delaware, 2d February, 1786; Maryland, November, 1799, and 3d January, 1807; Virginia, 7th February, 1819; North Carolina, Hayward's Digest, 668, and 1831; South Carolina, 1783.

*Laws relating to Coloured Passengers and Seamen.* Delaware, 19th January, 1826, and 7th February, 1827; Maryland, November, 1796, and November, 1809; Virginia, 1 Rev. Laws, 428, 432, 443, 444; Act 24th February, 1827, and 11th March, 1834; North Carolina, Act 1791, 1788; November, 1819, 1825, 1826, 1830, and 1832; South Carolina, 18th December, 1817, 19th December, 1835; Georgia, 26th December, 1817, 23d December, 1833, and 26th March, 1835; Louisiana, 26th March, 1835.

*Destroying Vessels.* Maine, 27th February, 1821; Massachusetts, Rev. Stat. 1834, p. 725; Connecticut, Rev. Laws, 1835; New York, 2 Rev. Stat. 667; Maryland, November, 1809; Delaware, 1782.

*Harbour Regulations.* Maine, 2d March, 1821, 12th February, 1828, and 11th March, 1835; Connecticut, Rev. Laws, 1835, Tit. 73; New Hampshire, 18th February, 1793; Maryland, November, 1807, 25th January, 1806, and 13th March, 1834; Pennsylvania, 29th March, 1803; Virginia, 3d March, 1821, 17th January, 1829, and 7th April, 1831; North Carolina, Rev. Laws, c. 194; Louisiana, 17th February, 1831; Alabama, 20th December, 1825, 21st January, 1832.

Mr. White, for the defendant, stated the case to be of great general importance, not only as it affects the commerce of the city of New York, but as it affects the laws of the United States, and the treaties entered into with foreign commercial nations.  If the evils which the law of New York is intended to remedy or prevent, exist, or may occur; congress may pass a law to provide a remedy, as this legislation by the state of New York is not authorized by the constitution, and is void.  It is in direct opposition to the power which is given by the constitution to congress to regulate commerce; and is in actual collision with that power as it has been exercised by congress.

The law is not a law which prevents the admission of felons and passengers into New York, but which affects the navigation of all countries, as connected by their commerce with this country; and conflicts with the express stipulations of treaties for the regulation of that commerce.  It introduces new arrangements, requires other forms, establishes additional penalties, and prohibits many things which are not so regulated by these treaties.  This Court will look at the consequences to follow from such a law; and by so doing they will see how extensive must be its effects.  The powers of the states to establish harbour laws, and to preserve the navigation of rivers by preventing obstructions in them, are not denied; but these powers are of an entirely different character from the provisions of the law under consideration.

The law regulates the whole passenger commerce of the port of New York; it imposes duties, requires stipulations, and creates liabilities which do not exist in the acts of congress relative to passengers, and enjoins duties on aliens which are not required by these laws.  Congress having made all the provisions relative to passengers, which having the power to regulate commerce, has been thought necessary by it; the requirements of the law of New York are in direct conflict with and repugnant to these provisions; and should therefore be declared void.

A reference to the law of New York will show the number and extent of the duties imposed on masters of ships and their owners by this law, beyond the demands of the law of the United States. The master must make a report of the passengers who were on board his vessel during any part of the voyage; he must give a bond, with surety, to prevent their being chargeable to the city of New York;

he must remove any of the passengers who may become chargeable: and penalties are imposed, and the forfeiture of the vessel is to be made by proceedings of an admiralty character, before a court of New York, if any neglect or violation of these duties shall occur. Do not these interfere and conflict with the powers given to congress to regulate commerce? Are they not in conflict with the passenger laws of the United States?

Two cases have been decided in this Court which settle and determine all the questions which can arise in the case now presented. Before the case of Gibbons v. Ogden, it had not been fully ascertained what was the constitutional interpretation of that part of the instrument which gives to congress the power " to regulate commerce;" but this Court in that case, gave to it a full and a most satisfactory interpretation. The regulation of commerce by congress is, since that case was decided, well understood; and the only question which can be properly presented to the Court now, is whether the principles of that case apply to this. The case will be found in 9 Wheaton, and the principles referred to are in pages 189, 197, of the report.

Commerce is not merely buying and selling, and the exchanges of commodities. It is navigation, and the intercourse between nations. As it includes navigation, so it includes all the uses and purposes of it, as well the transportation of passengers and persons, as of goods, and every thing connected with them, and with each of them. Such also is the definition of commerce in the case of Wilson v. The State of Maryland, 12 Wheat. 445, 447.

The examination of the statute of New York, which has already been submitted, fully establishes the position that the whole of its provisions are commercial regulations. Its application is to all passengers; and it operates on the business of navigation, and the uses of shipping as they are employed in one of the most profitable, and important of its purposes.

Sanitary regulations, quarantine laws which affect passengers, are in England made by acts of parliament, and are not police regulations; and even if such are in part the purposes of the act of the legislature of New York, they have gone far beyond those objects, and have embraced requirements which could not be constitutionally touched.

One of the great and prominent inducements to form the constitution, was the necessity, universally felt and acknowledged, to esta-

[City of New York v. Miln.]

blish uniform commercial regulations. The importance of this was seen by all; and hence the surrender of the power to regulate commerce, by the states to the general government. The first movement of the purpose to establish the present government, was by Mr. Madison, under the influence of the importance of a uniform commercial system; and from this arose the appointment of the convention, which adopted the present constitution. The main object of this government will be at an end, if the states can exercise the power which is claimed by New York under this law. As the government of the United States in its relations with foreign powers, might be affected by state legislation on matters connected with commerce, it became essential that every thing which affected commercial intercourse should be exclusively given to the government of the United States. By this means the relations of the government with foreign nations could be preserved; and the stipulations for equal privileges, of the citizens of foreign nations connected with the United States by commercial treaties, cannot be disturbed; without this all would have been confusion.

Mr. Jones for the defendant, considered this case as relieved from all difficulties as to the application of the provisions of the constitution of the United States to it. With the decisions of this Court in the case of Gibbons v. Ogden before them, it would be seen that the law of New York is a regulation of commerce, and is necessarily invalid. The provisions of the law interferes with a very important part of the commercial operations of the country; it affects the employment of the ships and vessels of other states, besides those of New York: it goes across the ocean, and interferes there with the operations of packet ships, prescribing the description of persons who may be brought on board of them; and subjecting the masters and owners of the vessels to duties and liabilities, which do not exist under the laws of the United States, and cannot therefore be imposed by a state law.

There may be police regulations, which are not commercial; other regulations may be both those of police and of commerce. While the police of the cities and states of the Union is entirely within the power of the states; it does not follow as a consequence, that where commerce is interfered with by the rules of police, they are constitutional. Many regulations may be applied in the commercial cities to business matters, connected with commerce, which are not

commercial; and the argument in favour of such regulations as those of the law of New York, derived from this state of things, is erroneous, as it confounded the thing with the use of it. The building of ships, the preservation of harbours, of wharves, the keeping open of rivers, may all be subjected to state laws. These are but the instruments of commerce, and not commerce itself. But if a state by its laws, shall impose regulations connected with the uses of these things which interfere with the operations of commerce; the constitutional power of congress is usurped, and the interference is void.

Let the array of state laws and state regulations, which has been presented by the counsel for the plaintiffs be examined by these principles, and they will be found constitutional or void, as the examination will result. The number of these laws will not protect them, if they are obnoxious to the constitutional power of congress. They will all be in pari delicto, if they so interfere. No precedent will sanction unconstitutional laws. The argument that a similar law of every state conflicts with the constitution, only shows the extent of the mischief, and the greater necessity for its cure.

It has been said, by the counsel of the plaintiff, that the constitution of the United States, and the highest authority acting under it, has conceded the power exercised by New York to the states; and the ninth section of the constitution is referred to, which prohibits congress from interfering with the intercourse between the states for a period. It is known that this provision had a special application to particular persons. But taking its provision in its general sense, it would appear that without it, the power existed; and the provision was only to suspend the action of congress on the subject, the right of which was vested in that body.

It was under the powers to regulate commerce that the slave trade was regulated; but the claim to interfere with that trade was not derived from the provision which related to migration and importation between states.

But it is said that if this provision gives congress the power of interference, it also gives it or admits its existence in the states. This is not considered a correct deduction. If a state law prohibiting migration or importation, shall be brought in question; the point will arise, as to the power of the state to legislate upon it. The provision of the constitution is, that for a certain time, congress shall not prohibit the admission of those persons the states may admit. The exception does not destroy the power, but suspends it. It is fully

granted, and could have been executed instantly, but for the limitation; and when that expired, it came into active existence. It was from that time as full as if it had never been interfered with.

The argument which is presented on the resolution of congress after the adoption of the constitution, and before it went into operation, which recommended the states to pass laws prohibiting the admission of felons; asserts that the states may prevent the admission of all persons, unless under onerous conditions. But no such inference is justifiable. The law of New York is a prohibition of emigration; and if carried into full effect will entirely prevent the entrance of all persons from abroad into the city of New York, the great throat of emigration. It applies to all passengers coming to New York; and operates on every ship or vessel taking passengers for New York, in any foreign country.

It is attempted to draw a distinction between this case, and the cases which exist by the great powers to regulate commerce under the constitution. This is said to be but an incident to those powers, and not important, or necessarily interfering with them; and, therefore, within state legislation. But if this is an incident only, and may be taken away from the general government, the whole power to regulate emigration may be taken away; the whole passenger trade of the United States may be cut off; and thus one of the principal powers of the general government will be destroyed.

We have shown enactments by the national legislature under the constitution relative to passengers, and thus congress have come in and occupied the ground. The right no longer rests upon the abstract question, whether it may be exercised. It has been used, and it is exclusive from its very nature. If it is said that provisions applicable to all cases have not been made; it may be said, with perfect safety, that they have not been thought necessary or proper. Their not having been made, is evidence that congress did not deem them requisite. They are judges of the mode in which the power shall be used. The subject having been once within their view, it must be considered that they have done with it all they considered it required; as in the case of a bankrupt law. By establishing a uniform system of bankruptcy the whole power to legislate on the subject was occupied; and a state could not come in and legislate on matters which were not referred to, or provided for in the legislation of congress, on the ground that having been omitted, they could be so regulated. The wisdom of the legislature of the general govern-

[City of New York v. Miln.]

ment is to be regarded as having looked over the whole of the subject, and to have done all that ought to be done.

There is a direct conflict between the laws of the United States and the law of New York; for every thing is in conflict with these laws on the subject of passengers, which adds to the regulations established by them. So, also, the law of New York conflicts with treaties; for they impose upon the citizens and subjects of countries, united to us by treaties, restrictions not known to the general laws, and not contemplated as applicable to them. In fact, if such a law as this before the Court may be passed by a state, a total prohibition of the entrance of a foreigner into the United States may be enacted by the legislature of the state; and then a treaty, containing assurances of ingress and protection to the citizens or subjects of a foreign state, would cease to be the supreme law of the land.

It is denied that congress, under the confederation, had the power to give to the states authority to pass laws relative to the admission of persons into their territorial limits. This would allow to that body authority to legislate over the constitution then coming into existence, and to supersede its provisions. The resolution was passed in the expiring hour of that body; and although many of those who formed the constitution were members of the confederate congress, that fact does not authorize the deduction, that, by adopting the resolution, they meant to give a construction to the constitutional provision with which it interfered. It was intended to operate on a present evil, and not to be a permanent law.

Mr. Ogden for the plaintiff.

The defendant, in this case, states himself to be an alien, but does not state in his application to remove the cause from the superior court of the city of New York into the circuit court, from what country he came into the United States; but it is a fact worthy of notice, that, although a stranger among us, he has undertaken to teach us constitutional law. He assumes to set aside a law of New York, and to break down a policy which has existed for nearly thirty years, without, until now, a claim to object to its provisions or its purposes. The first act which contained provisions relative to passengers was called " an act for the relief and settlement of the poor." The act before the Court is the same with that law, in purpose, and in many of its provisions.

VOL. XI.—Q

[City of New York v. Miln.]

The question is, whether the legislature of New York, by an act in force for the long period stated, have violated the constitution of the United States; and the act under consideration, therefore, is a nullity, having been passed in controversion of the constitution. The simple statement of the question is sufficient to show its importance.

It is the high prerogative of this Court to examine the laws of the different states, and of congress, and the constitution of the United States. To do this is the duty imposed upon the Court by the constitution, confided to it by the people; and from the discharge and performance of which it will not shrink. The power to pronounce a law of a state legislature null and void, as being against the provisions of the constitution of the United States, is not only a great and important one; but, because it is so, it should be exercised with great care and caution. To suffer state legislatures to disregard the constitution of the Union, which all their members are sworn to support, would soon leave the constitution a dead letter, destroy its efficiency, and put an end to every hope of benefit to be derived from it. On the other hand, to take from the legislatures of the different states the powers legitimately vested in them, by a forced construction of the constitution, would be equally fatal to it; by exciting state pride and state feelings against it; and thus driving it from that place in the good opinion, feelings, and affections of the people, without which it cannot long exist.

It is respectfully submitted that the power to declare a state law void, which unquestionably exists in this Court, should never be exercised in a doubtful case. It is an extremely delicate power; and should only be called into action in cases so free from doubt, as to secure at once the acquiescence of state authorities and of the public. This case has been already before the Court, and was argued at a former term. It is now under consideration a second time, the Court having been divided in opinion after the first argument. This is evidence that the question involved in it is a doubtful one; and serves to afford at least a plausible ground of argument against any judgment being given against the validity of the state law.

Mr. Ogden stated that he did not belong to that school of politicians, or lawyers, who are in favour of giving to the constitution of the United States a construction restricted to its words. All his reflections, and all his habits of thinking had induced him to give a more liberal interpretation and application to that instrument. The

preservation of the constitution, in its true spirit, is essential to the prosperity and freedom of this country. Give to it all its fair, proper, and essential powers, and the hope may be safely entertained that it will daily acquire more strength, and that it will extend, and continue to increase its benign influence over our people, as they increase in numbers, and as our country advances in wealth, in arts, and in all that is calculated to enlarge the minds and augment the happiness of our citizens. On this occasion it is not, therefore, proposed to advocate a restricted, limited, and narrow construction of the constitution. But while this is properly and necessarily to be avoided, it is not to be stretched beyond its proper limits; or, like every thing else, it will break and be destroyed.

It must always be borne in mind, when discussing and considering a question arising under the constitution, that it was not formed by a people who were without any government; but by the people of several independent states, all of whom had in their respective territories well organized governments in full operation. These states, independent in themselves, had entered into certain articles of confederation; under which they had formed a union, for the purposes of contending for, and maintaining their independence. When that was obtained, the articles by which they were bound together were found to be totally inadequate for their continued government as a nation. This was the reason why the present constitution was adopted by the people; as is briefly, but strongly and clearly, declared in the preamble to the instrument.

It may be proper to remark, and the influence of this fact in this case will be seen hereafter, that the articles of confederation were not made between the people of the several states, but by the state governments; but the constitution was made, emphatically, by the people of the United States, and adopted by them in convention. The state governments could form no such constitution; they had no powers to do so delegated or intrusted to them. The people are the sources of this power, both of the state and general governments; and after forming the constitution, they declared " this constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties, &c., shall be the supreme law of the land." The constitution, then, so far as it extends, is by the declared will of the people supreme; and is so to be considered in all courts, and by all persons in the United States.

Before the constitution was formed and established, all the powers

of government had been granted by the people, and vested by them in their several state governments. By the constitution of the union, the people granted to the government of the United States certain powers, for certain purposes and objects; and so far as.these were so granted, and the states excluded from them, they were taken from the state governments, by those who gave these governments their existence; and by those who had a right and power to give and take away. That the constitution was a grant of powers by the people of the United States, is not only supported by the whole tenor of the constitution, but is so declared in express words. In the first article it is said, " All legislative powers herein granted shall be vested in congress," &c. Whenever, therefore, a question occurs as to the constitutional powers of the general government, we must examine whether it be within the powers granted, or which are necessary to carry into effect the powers granted. But the powers of the general government are not now in question; the question is, whether the power exercised by the legislature of New York in passing the law now under consideration is prohibited; or rather whether it was taken away from the legislature by the constitution. If both the state and the general government had been formed at the same time, the question would have been different. It would then have been what powers were given to each.

In some enumerated cases all powers are taken away. The power " to coin money," " to issue bills of credit," " to pass tender laws." In another class of cases, the state legislatures cannot act without the consent of congress. The states may not lay duties, except they are necessary for their inspection laws; unless congress affirms their laws imposing them. In this class of cases the states may legislate with the consent of congress, and their acts will then have validity. Cases also exist in which the power of states is taken away by necessary implication. This class includes cases only where the exercise of state legislation upon the subject is wholly inconsistent with the powers vested in the government; and where the two powers must necessarily conflict with each other.

Now, if the law of the state of New York be unconstitutional, it is not because it is one of those cases in which all state legislation is expressly prohibited by the constitution, for it is not enumerated among the express prohibitions; nor because the consent of congress has not been obtained to the law, for it is not of the description of

[City of New York v. Miln.]

such cases; it can only be invalid, because the power to pass it is taken away by necessary implication.

Is the law repugnant to the powers vested in the general government? Admit it to be a regulation of commerce, is it therefore void? Power is given to congress to regulate commerce, but there is nothing in the constitution which compels congress to do so; and it might have been left to the action of the states. Before the constitution was formed the states had commercial regulations; and if the power given to congress was exclusive, all these laws were repealed and void, when the constitution came into operation. This could not be, and it was not so understood by any state in the union. Every state has acted under a different interpretation of the constitution.

What would have been the situation of the commerce of the country, if on the adoption of the constitution the whole of the commercial regulations of the several states had become invalid? Until congress should legislate, all would have been confusion; and if the legislation had been incomplete, the evils of such imperfection would remain. No state laws, however long in force and necessary, could have been invoked to supply the deficiencies. But if the state laws are left in force until some act of congress should come in conflict with them, when they must yield; every principle of necessity or justice seems to be preserved.

The case of Sturgis v. Crowninshield, which came before this Court, decided that a state insolvent law was invalid, because it impaired the obligation of a contract, and came therefore within the provision of the constitution which has taken the power from the states to pass such laws.

In the case of Gibbons v. Ogden, it appeared that a law of New York had given to Livingston and Fulton the exclusive right to navigate the waters of New York, by steam boats. The navigation of these rivers was a part of the commerce of the United States, a part of the coasting trade which was open to all the citizens of the United States, in relation to which congress had exercised the powers granted to them by the constitution. They had made it necessary for all coasting vessels to take out licenses, which entitled them to navigate these waters; and the law of the state came directly in conflict with the act of congress, and with the licenses under it, and was therefore invalid.

The case of Brown v. The State of Maryland, in 10 Wheaton, and all the cases which have been cited, if examined, will show that none of

[City of New York v. Miln.]

the laws were declared invalid because they were regulations of commerce, but because they came in conflict with rights derived under acts of congress which are declared to be the supreme law of the land.

It is no answer to this argument to say that congress have legislated on the subject of the regulation of commerce, and has therefore exercised the powers vested in them by the constitution, to the exclusion of the states. Unless congress have legislated on the particular branch of the subject; unless they have so legislated, as that their law, and the law of New York, before the Court, are in collision with each other, no necessary implication requires that the state power should be considered as taken away.

In several cases, when powers are given to congress because the public interest requires there should be a general legislation on the subject, this Court has declared that the state power to legislate on it, has not been taken away until congress actually exercises the power granted to them. This is the case in bankruptcy, and in the laws relative to naturalization. As to the first; cited 10 Wheat. 196. As to naturalization, Collet v. Collet, 2 Dall. 294.

By the constitution, congress have power to regulate commerce with foreign nations, and with the Indian tribes.

At the time the constitution was adopted, in many of the states there were large bodies of Indians. In New York, the whole of the now populous western part of the state was occupied by Indians. Congress did not legislate on the subject of commerce with the Indians, until many years after the power was granted to it. During the whole of this period, was not the trade with the Indians left to the regulation of the states? If the power of congress as to general commerce was exclusive, was it not equally so as to the trade with the Indians?

It may be shown that congress have recognised the powers of the states relative to this subject, and the exercise of it.

A power to regulate commerce, must necessarily include the means and manner of carrying it on. The power to regulate pilots is therefore given to congress; but it has not been considered as exclusive. The states have regulated pilots, and have adopted different systems for their government, and to induce or compel the performance of the duties they assume. These state regulations have been recognised by congress, in the " act regulating light houses," passed August 1789. L. U. S. ch. 9, sec. 4, vol. 1. 34.

As to the proposition that a law of a state is valid when congress

[City of New York v. Miln.]

recognises it, and that it has its validity from this recognition; it is denied that congress have the power to make laws in any other form but by express legislation. A law which is unconstitutional, is not changed in its character by the recognition of congress. So to the admission that state laws are good until congress legislate on the same subject matter, is an admission that the power of congress over the subject is not exclusive. Quarantine laws are commercial in their nature, and they are the regulations of the states. They have been recognised by an act of congress, 3 Laws U. S. 126, c. 118. These laws declare how, where, and when goods imported under the authority of the laws and treaties of the United States, may be landed; and thus they materially interfere with, and affect commercial and shipping transactions.

If to a certain extent the passenger act of New York is a commercial regulation; in order to invalidate it, its conflict with the law of the United States on the subject, must be shown. There is no incompatibility between them. All the provisions of the laws of the United States are left in full force, and the New York law superadds other regulations, deemed necessary for the prevention of the introduction of paupers, and to prevent the city being charged with the support of the outcast population of foreign nations.

But if the Court shall be of opinion that the power of congress to regulate commerce is exclusive, and that it is taken from the states by the constitution; the question is presented, is this act of New York a regulation of commerce? It is denied to be such.

In the case of Brown v. The State of Maryland, 12 Wheat. 441, Mr. Chief Justice Marshall, to whose every word upon constitutional questions great attention is most justly due, and from whose expositions of the constitution, every one who reads them will derive instruction, says:—" In our complex system, the object of the powers conferred on the government of the Union, and the nature of the often conflicting powers which remain in the states, must always be taken into view, and may aid in expounding the words in any particular clause."

It is admitted, in this opinion, that there are powers which remain in the states, which must often conflict with the powers of congress; and in these cases we must always refer to, and take into view the object of the powers conferred on the general government of the Union. Now, without entering into an examination of any of the powers vested in congress, it is undoubtedly true that the object of

the people was to form a general, national government, and to take from the states no powers not necessary for that object. Health laws; poor laws; laws respecting the landing and storing of gunpowder; are all necessary for the safety and security of the particular states, or of the inhabitants of those states: and they are in nowise necessary or proper to be entrusted to the general government, and do not therefore come within the object for which it was established. They are not embraced within its words; and are therefore not taken from, but necessarily remain proper subjects of state regulation; although they may in some respects have an influence and bearing on the commerce of the country.

In the case of Gibbons v. Ogden, 9 Wheat. 203, the Chief Justice says:—"That inspection laws may have a remote and considerable influence on commerce, will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived, cannot be admitted. The object of inspection laws, is to improve the quality of articles produced by the labour of the country; to fit them for exportation; or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces every thing within the territory of a state not surrendered to the general government; all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c. are component parts."

And in the case of Brown v. The State of Maryland, in 12 Wheaton, the same great constitutional expounder says, "The power to direct the removal of gunpowder, is a branch of the police power which unquestionably remains and ought to remain in the states."

The power to regulate commerce is not that from which the right to pass the law is derived. It comes from a much higher source—from those great conservative rights which all governments have, and must have, and must maintain, and must preserve. The object of all well regulated governments is to promote the public good, and to secure the public safety; and the powers of that legislation necessarily extends to all those objects; and unless, therefore, in any particular case the power is given to the general government, it necessarily still remains in the states. It is under these principles

that the acts relative to police, which may operate on persons brought into a state in the course of commercial operations, and the laws relative to quarantine and gunpowder, are within the power of the states. They are not national in their character, and are not, therefore, essentially within national regulation. They are protected by the principles laid down in the cases referred to, by Mr. Chief Justice Marshall; when, in the complex system of our governments, they may come into conflict with the powers of the general legislation.

What are poor laws but police regulations? And are they not as essential to the security of all the inhabitants of a city, as are health laws, and all laws of the same character? The law in question, on its face, purports to be a poor law; and all its provisions relate to that subject. The power to pass poor laws involves in it the right to regulate the whole subject; and if the public, on principles of humanity and justice are bound to provide for the poor, and can compel individuals to contribute to their support, may not the law prevent the influx of strangers who have no claims on the community into which they would come, and who are sent among us by those whose duty it was to provide for and sustain them.

In Brown v. The State of Maryland, the Court say, " Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed. On this principle, if the right to pass poor laws exists in the state, the extent of it is to be decided by the legislatures of the states."

It has been the policy of the general government to encourage the emigration of foreigners to this country. With the wisdom of that policy we have nothing to do; congress are the sole judges of it. They have the power to regulate the manner in which they shall be brought here, under the power to regulate commerce, and they have the sole power of holding out encouragement to them to come here by a naturalization system.

But when they once arrive in this country, they must submit to the poor laws of the state in which they land; and with which congress have nothing to do. These laws have always regulated them; and they take care that after being brought into the country they shall not become burthensome to it. The powers of congress apply to their transit from abroad; they extend over the navigation employed for this purpose, and they go no further. No state can interfere with any such provisions; but this does not restrict the

authority of the state to interfere for its own safety, after all objects of the legislation of congress are accomplished.

If congress may regulate passengers from one state to another, their power will extend to compel the states to permit paupers to pass from one state into another state. This, or any power to interfere with the regulations a state may adopt upon matters of this kind, will not, and never has been claimed.

A treaty between the United States and a foreign nation cannot annul a state law rightfully and constitutionally enacted by a state, and in reference to matters within the power of her legislature. Treaties refer to commercial intercourse and advantages; and the law under the consideration of the Court does not interfere with the provisions of any treaty.

The law of a state may require more than congress have thought necessary; but, if the additional provisions impose duties which are required for police and internal safety, such as the laws relative to paupers and gunpowder, and they do not interfere with or interrupt the action of the laws of the United States; they are not exceptionable.

Mr. Justice BARBOUR delivered the opinion of the Court.

This case comes before this Court upon a certificate of division of the circuit court of the United States for the southern district of New York.

It was an action of debt brought in that court by the plaintiff, to recover of the defendant, as consignee of the ship called the Emily, the amount of certain penalties imposed by a statute of New York, passed February 11th, 1824; entitled, An act concerning passengers in vessels coming to the port of New York.

The statute, amongst other things, enacts, that every master or commander of any ship, or other vessel, arriving at the port of New York, from any country out of the United States, or from any other of the United States than the state of New York, shall, within twenty-four hours after the arrival of such ship or vessel in the said port, make a report in writing, on oath or affirmation, to the mayor of the city of New York, or, in case of his sickness, or absence, to the recorder of the said city, of the name, place of birth, and last legal settlement, age and occupation, of every person who shall have been brought as a passenger in such ship or vessel, on her last voyage from any country out of the United States into the

port of New York, or any of the United States, and from any of the United States other than the state of New York, to the city of New York, and of all passengers who shall have landed, or been suffered or permitted to land, from such ship, or vessel, at any place, during such her last voyage, or have been put on board, or suffered, or permitted to go on board of any other ship or vessel, with the intention of proceeding to the said city, under the penalty on such master or commander, and the owner or owners, consignee or consignees of such ship or vessel, severally and respectively, of seventy-five dollars for every person neglected to be reported as aforesaid, and for every person whose name, place of birth, and last legal settlement, age, and occupation, or either or any of such particulars, shall be falsely reported as aforesaid, to be sued for and recovered as therein provided.

The declaration alleges that the defendant was consignee of the ship Emily, of which a certain William Thompson was master; and that in the month of August, 1829, said Thompson, being master of such ship, did arrive with the same in the port of New York, from a country out of the United States, and that one hundred passengers were brought in said ship on her then last voyage, from a country out of the United States, into the port of New York; and that the said master did not make the report required by the statute, as before recited.

The defendant demurred to the declaration.

The plaintiff joined in the demurrer, and the following point, on a division of the court, was thereupon certified to this Court, viz.

"That the act of the legislature of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the port of New York and foreign ports, and is unconstitutional and void."

It is contended by the counsel for the defendant, that the act in question is a regulation of commerce; that the power to regulate commerce is, by the constitution of the United States, granted to congress; that this power is exclusive, and that consequently, the act is a violation of the constitution of the United States.

On the part of the plaintiff it is argued, that an affirmative grant of power previously existing in the states to congress, is not exclusive; except 1st, where it is so expressly declared in terms, by the clause giving the power; or 2dly, where a similar power is prohibited to the states; or 3dly, where the power in the states would be repug-

nant to, and incompatible with, a similar power in congress: that this power falls within neither of these predicaments; that it is not, in terms, declared to be exclusive; that it is not prohibited to the states; and that it is not repugnant to, or incompatible with, a similar power in congress; and that having pre-existed in the states, they therefore have a concurrent power in relation to the subject; and that the act in question would be valid, even if it were a regulation of commerce, it not contravening any regulation made by congress.

But they deny that it is a regulation of commerce : on the contrary, they assert that it is a mere regulation of internal police, a power over which is not granted to congress; and which therefore, as well upon the true construction of the constitution, as by force of the tenth amendment to that instrument, is reserved to, and resides in the several states.

, We shall not enter into any examination of the question whether the power to regulate commerce, be or be not exclusive of the states, because the opinion which we have formed renders it unnecessary: in other words, we are of opinion that the act is not a regulation of commerce, but of police; and that being thus considered, it was passed in the exercise of a power which rightfully belonged to the states.

That the state of New York possessed power to pass this law before the adoption of the constitution of the United States, might probably be taken as a truism, without the necessity of proof. But as it may tend to present it in a clearer point of view, we will quote a few passages from a standard writer upon public law, showing the origin and character of this power.

Vattel, book 2d, chap. 7th, sec. 94. " The sovereign may forbid the entrance of his territory, either to foreigners in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to the state."

Ibid. chap. 8, sec. 100. ." Since the lord of the territory may, whenever he thinks proper, forbid its being entered, he has, no doubt, a power to annex what conditions he pleases, to the permission to enter."

The power then of New York to pass this law having undeniably existed at the formation of the constitution, the simple inquiry is, whether by that instrument it was taken from the states, and granted to congress; for if it were not. it yet remains with them.

If, as we think, it be a regulation, not of commerce, but police;

[City of New York v. Miln.]

then it is not taken from the states. To decide this, let us examine its purpose, the end to be attained, and the means of its attainment.

It is apparent, from the whole scope of the law, that the object of the legislature was, to prevent New York from being burdened by an influx of persons brought thither in ships, either from foreign countries, or from any other of the states; and for that purpose a report was required of the names, places of birth, &c. of all passengers, that the necessary steps might be taken by the city authorities, to prevent them from becoming chargeable as paupers.

Now, we hold that both the end and the means here used, are within the competency of the states, since a portion of their powers were surrendered to the federal government. Let us see what powers are left with the states. The Federalist, in the 45th number, speaking of this subject, says; the powers reserved to the several states, will extend to all the objects, which in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the state.

And this Court, in the case of Gibbons v. Ogden, 9 Wheat. 203, which will hereafter be more particularly noticed, in speaking of the inspection laws of the states, say; they form a portion of that immense mass of legislation which embraces every thing within the territory of a state, not surrendered to the general government, all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass.

Now, if the act in question be tried by reference to the delineation of power laid down in the preceding quotations, it seems to us that we are necessarily brought to the conclusion, that it falls within its limits. There is no aspect in which it can be viewed in which it transcends them. If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction. If we look at the persons for whose benefit it was passed, they are the people of New York, for whose protection and welfare the legislature of that state are authorized and in duty bound to provide.

If we turn our attention to the purpose to be attained, it is to secure that very protection, and to provide for that very welfare. If

we examine the means by which these ends are proposed to be accomplished, they bear a just, natural, and appropriate relation to those ends.

But we are told that it violates the constitution of the United States, and to prove this we have been referred to two cases in this court; the first, that of Gibbons v. Ogden, 9 Wheat. 1, and the other that of Brown v. The State of Maryland, 12 Wheat. 419.

The point decided in the first of these cases is, that the acts of the legislature of New York, granting to certain individuals the exclusive navigation of all the waters within the jurisdiction of that state, with boats moved by steam, for a term of years, are repugnant to the clause of the constitution of the United States which authorizes congress to regulate commerce, so far as the said acts prohibit vessels licensed according to the laws of the United States for carrying on the coasting trade, from navigating said waters by means of steam. In coming to that conclusion, this Court, in its reasoning, laid down several propositions; such as, that the power over commerce included navigation; that it extended to the navigable waters of the states; that it extended to navigation carried on by vessels exclusively employed in transporting passengers. Now, all this reasoning was intended to prove that a steam vessel licensed for the coasting trade, was lawfully licensed by virtue of an act of congress; and that as the exclusive right to navigate the waters of New York, granted by the law of that state, if suffered to operate, would be in collision with the right of the vessel licensed under the act of congress to navigate the same waters; and that as when that collision occurred the law of the states must yield to that of the United States, when lawfully enacted; therefore, the act of the state of New York was in that case void.

The second case, to wit, that of Brown against The State of Maryland, 12 Wheat. 419, decided that the act of the state of Maryland, requiring all importers of foreign goods by the bale or package, and other persons selling the same by wholesale, bale or package, &c., to take out a license for which they should pay fifty dollars, and in case of neglect or refusal to take out such license, subjecting them to certain forfeitures and penalties, was repugnant, first, to that provision of the constitution of the United States, which declares that "no state shall, without the consent of congress, lay any impost, or duty on imports or exports, except what may be absolutely necessary for executing its inspection laws;" and secondly,

to that which declares that congress shall have power "to regulate commerce with foreign nations, among the several state., and with the Indian tribes."

Now, it is apparent from this short analysis of these two cases, that the question involved in this case is not the very point which was decided in either of those which have been referred to.

Let us examine whether, in the reasoning of the Court, there is any principle laid down in either of them, which will go to prove that the section of the law of New York, on which this prosecution is founded, is a violation of the constitution of the United States.

In Gibbons against Ogden, the law of the state assumed to exercise authority over the navigable waters of the state; to do so, by granting a privilege to certain individuals, and by excluding all others from navigating them by vessels propelled by steam; and in the particular case, this law was brought to bear in its operation directly upon a vessel sailing under a coasting license from the United States.

The Court were of opinion, that as the power to regulate commerce embraced within its scope that of regulating navigation also; as the power over navigation extended to all the navigable waters of the United States; as the waters on which Gibbons' vessel was sailing were navigable; and as his vessel was sailing under the authority of an act of congress; the law of the state, which assumed by its exclusive privilege granted to others, to deprive a vessel thus authorized of the right of navigating the same waters, was a violation of the constitution of the United States, because it directly conflicted with the power of congress to regulate commerce. Now, there is not, in this case, one of the circumstances which existed in that of Gibbons v. Ogden, which, in the opinion of the Court, rendered it obnoxious to the charge of unconstitutionality.

On the contrary, the prominent facts of this case are in striking contrast with those which characterized that:

In that case, the theatre on which the law operated was navigable water, over which the Court say that the power to regulate commerce extended; in this, it was the territory of New York over which that state possesses an acknowledged and undisputed jurisdiction for every purpose of internal regulation: in that, the subject matter on which it operated, was a vessel claiming the right of navigation; a right which the Court say is embraced in the power to regulate commerce: in this, the subjects on which it operates are

persons whose rights and whose duties are rightfully prescribed and controlled by the laws of the respective states within whose territorial limits they are found: in that, say the Court, the act of a state came into direct collision with an act of the United States: in this, no such collision exists.

Nor is there the least likeness between the facts of this case, and those of Brown against The State of Maryland. The great grounds upon which the Court put that case were:—that sale is the object of all importation of goods; that, therefore, the power to allow importation, implied the power to authorize the sale of the thing imported: that a penalty inflicted for selling an article in the character of importer, was in opposition to the act of congress, which authorized importation under the authority to regulate commerce: that a power to tax an article in the hands of the importer the instant it was landed, was the same in effect as a power to tax it whilst entering the port; that, consequently, the law of Maryland was obnoxious to the charge of unconstitutionality, on the ground of its violating the two provisions of the constitution; the one giving to congress the power to regulate commerce, the other forbidding the states from taxing imports.

In this case, it will be seen that the discussion of the Court had reference to the extent of the power given to congress to regulate commerce, and to the extent of the prohibition upon the states from imposing any duty upon imports. Now it is difficult to perceive what analogy there can be between a case where the right of the state was inquired into, in relation to a tax imposed upon the sale of imported goods, and one where, as in this case, the inquiry is as to its right over persons within its acknowledged jurisdiction; the goods are the subject of commerce, the persons are not: the Court did indeed extend the power to regulate commerce, so as to protect the goods imported from a state tax after they were landed, and were yet in bulk; but why? Because they were the subjects of commerce; and because, as the power to regulate commerce, under which the importation was made, implied a right to sell; that right was complete, without paying the state for a second right to sell, whilst the bales or packages were in their original form. But how can this apply to *persons?* They are not the subject of commerce; and, not being *imported goods,* cannot fall within a train of reasoning founded upon the construction of a power given to congress to regulate

[City of New York v. Miln.]

commerce, and the prohibition to the states from imposing a duty on imported goods.

Whilst, however, neither of the points decided in the cases thus referred to, is the same with that now under consideration, and whilst the general scope of the reasoning of the Court in each of them, applies to questions of a different nature; there is a portion of that reasoning in each which has a direct bearing upon the present subject, and which would justify measures on the part of states, not only approaching the line which separates regulations of commerce from those of police, but even those which are almost identical with the former class, if adopted in the exercise of one of their acknowledged powers. In Gibbons against Ogden, 9 Wheaton, 204, the Court say, if a state, in passing laws on a subject acknowledged to be within its control, and, with a view to those subjects, shall adopt a measure of the same character with one which congress may adopt; it does not derive its authority from the particular power which has been granted, but from some other which remains with the state, and may be executed by the same means. All experience shows that the same measures, or measures scarcely distinguishable from each other, may flow from distinct powers; but this does not prove that the powers are identical. Although the means used in their execution may sometimes approach each other, so nearly as to be confounded, there are other situations in which they are sufficiently distinct to establish their individuality.

In page 209, the Court say :—Since, however, in regulating their own purely internal affairs, whether of trading or of police, the states may sometimes enact laws, the validity of which depends on their interfering with, and being contrary to an act of congress passed in pursuance of the constitution; they would inquire whether there was such collision in that case, and they came to the conclusion that there was.

From this it appears, that whilst a state is acting within the legitimate scope of its power as to the end to be attained, it may use whatsoever means, being appropriate to that end, it may think fit; although they may be the same, or so nearly the same, as scarcely to be distinguishable from those adopted by congress acting under a different power: subject, only, say the Court, to this limitation, that in the event of collision, the law of the state must yield to the law of congress. The Court must be understood, of course, as meaning

that the law of congress is passed upon a subject within the sphere of its power.

Even then, if the section of the act in question could be considered as partaking of the nature of a commercial regulation, the principle here laid down would save it from condemnation, if no such collision exist.

It has been contended, at the bar, that there is that collision; and in proof of it we have been referred to the revenue act of 1799, and to the act of 1819, relating to passengers. The whole amount of the provision in relation to this subject, in the first of these acts, is to require, in the manifest of a cargo of goods, a statement of the names of the passengers, with their baggage, specifying the number and description of packages belonging to each respectively: now it is apparent, as well from the language of this provision, as from the context, that the purpose was to prevent goods being imported without paying the duties required by law, under the pretext of being the baggage of passengers.

The act of 1819, contains regulations obviously designed for the comfort of the passengers themselves: for this purpose it prohibits the bringing more than a certain number proportioned to the tonnage of the vessel, and prescribes the kind and quality of provisions, or sea stores, and their quantity, in a certain proportion to the number of the passengers.

Another section requires the master to report to the collector a list of all passengers, designating the age, sex, occupation, the country to which they belong, &c.; which list is required to be delivered to the secretary of state, and which he is directed to lay before congress. The object of this clause, in all probability, was to enable the government of the United States, to form an accurate estimate of the increase of population by emigration; but whatsoever may have been its purpose, it is obvious, that these laws only affect, through the power over navigation, the passengers whilst on their voyage, and until they shall have landed. After that, and when they have ceased to have any connexion with the ship, and when, therefore, they have ceased to be *passengers;* we are satisfied, that acts of congress, applying to them as such, and only professing to legislate in relation to them *as such,* have then performed their office, and can, with no propriety of language, be said to come into conflict with the law of a state, whose operation only begins when that of the laws of congress ends; whose operation is not even on the same subject, because al-

[City of New York v. Miln.]

though the person on whom it operates is the same, yet having ceased to be a *passenger*, he no longer stands in the only relation in which the laws of congress either professed or intended to act upon him.

There is, then, no collision between the law in question, and the acts of congress just commented on; and, therefore, if the state law were to be considered as partaking of the nature of a commercial regulation; it would stand the test of the most rigid scrutiny, if tried by the standard laid down in the reasoning of the Court, quoted from the case of Gibbons against Ogden.

But we do not place our opinion on this ground. We choose rather to plant ourselves on what we consider impregnable positions. They are these: That a state has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation; where that jurisdiction is not surrendered or restrained by the constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a state, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation, which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called *internal police*, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a state is complete, unqualified, and exclusive.

We are aware, that it is at all times difficult to define any subject with proper precision and accuracy; if this be so in general, it is emphatically so in relation to a subject so diversified and multifariou as the one which we are now considering.

If we were to attempt it, we should say, that every law came within this description which concerned the welfare of the whole people of a state, or any individual within it; whether it related to their rights, or their duties; whether it respected them as men, or as citizens of the state; whether in their public or private relations; whether it related to the rights of persons, or of property, of the whole people of a state, or of any individual within it; and whose operation was within the territorial limits of the state, and upon the persons and things within its jurisdiction. But we will endeavour to illustrate our meaning rather by exemplification, than by definition. No one will deny, that a state has a right to punish

[City of New York v. Miln.]

any individual found within its jurisdiction, who shall have committed an offence within its jurisdiction, against its criminal laws. We speak not here of foreign ambassadors, as to whom the doctrines of public law apply. We suppose it to be equally clear, that a state has as much right to guard, by anticipation, against the commission of an offence against its laws, as to inflict punishment upon the offender after it shall have been committed. The right to punish, or to prevent crime, does in no degree depend upon the citizenship of the party who is obnoxious to the law. · The alien who shall just have set his foot upon the soil of the state, is just as subject to the operation of the law, as one who is a native citizen. In this very case, if either the master, or one of the crew of the Emily, or one of the passengers who were landed, had, the next hour after they came on shore, committed an offence, or indicated a disposition to do so; he would have been subject to the criminal law of New York, either by punishment for the offence committed, or by prevention from its commission where good ground for apprehension was shown, by being required to enter into a recognisance with surety, either to keep the peace, or be of good behaviour, as the case might be; and if he failed to give it, by liability to be imprisoned in the discretion of the competent authority. Let us follow this up to its possible results. If every officer, and every seaman belonging to the Emily, had participated in the crime, they would all have been liable to arrest and punishment; although, thereby, the vessel would have been left without either commander or crew. Now why is this? For no other reason than this, simply, that being within the territory and jurisdiction of New York, they were liable to the laws of that state, and amongst others, to its criminal laws; and this too, not only for treason, murder, and other crimes of that degree of atrocity, but for the most petty offence which can be imagined.

It would have availed neither officer, seaman, or passenger, to have alleged either of these several relations in the recent voyage across the Atlantic. The short but decisive answer would have been, that we know you now only as offenders against the criminal laws of New York, and being now within her jurisdiction, you are now liable to the cognisance of those laws. Surely the officers and seamen of the vessel have not only as much, but more concern with navigation than a passenger; and yet, in the case here put, any and every one of them would be held liable. There would be the same liability, and for the same reasons, on the part of the officers, seamen,

and passengers to the civil process of New York, in a suit for the most trivial sum; and if, according to the laws of that state, the party might be arrested and held to bail, in the event of his failing to give it, he might be imprisoned until discharged by law.

Here, then, are the officers and seamen, the very agents of navigation, liable to be arrested and imprisoned under civil process, and to arrest and punishment under the criminal law.

But the instrument of navigation, that is, the vessel, when within the jurisdiction of the state, is also liable by its laws to execution. If the state have a right to vindicate its criminal justice against the officers, seamen, and passengers who are within its jurisdiction, and also, in the administration of its civil justice, to cause process of execution to be served on the body of the very agents of navigation, and also on the instrument of navigation, under which it may be sold, because they are within its jurisdiction and subject to its laws; the same reasons, precisely, equally subject the master, in the case before the Court, to liability for failure to comply with the requisitions of the section of the statute sued upon. Each of these laws depends upon the same principle for its support; and that is, that it was passed by the state of New York, by virtue of her power to enact such laws for her internal police as it deemed best; which laws operate upon the persons and things within her territorial limits, and therefore within her jurisdiction

Now in relation to the section in the act immediately before us, that is obviously passed with a view to prevent her citizens from being oppressed by the support of multitudes of poor persons, who come from foreign countries without possessing the means of supporting themselves. There can be no mode in which the power to regulate internal police could be more appropriately exercised. New York, from her particular situation, is, perhaps more than any other city in the Union, exposed to the evil of thousands of foreign emigrants arriving there, and the consequent danger of her citizens being subjected to a heavy charge in the maintenance of those who are poor. It is the duty of the state to protect its citizens from this evil; they have endeavoured to do so, by passing, amongst other things, the section of the law in question. We should, upon principle, say that it had a right to do so.

Let us compare this power with a mass of power, said by this Court in Gibbons against Ogden, not to be surrendered to the general government. They are inspection laws, quarantine laws, health

laws of every description, as well as laws for regulating the internal commerce of a state, &c.   To which it may be added, that this Court, in Brown against The State of Maryland, admits the power of a state to direct the removal of gunpowder, as a branch of the police power, which unquestionably remains, and ought to remain with the states.

It is easy to show, that if these powers, as is admitted, remain with the states, they are stronger examples than the one now in question.   The power to pass inspection laws, involves the right to examine articles which are imported, and are, therefore, directly the subject of commerce; and if any of them are found to be unsound, or infectious, to cause them to be removed, or even destroyed.   But the power to pass these inspection laws, is itself a branch of the general power to regulate internal police.

Again, the power to pass quarantine laws, operates on the ship which arrives, the goods which it brings, and all persons in it, whether the officers and crew, or the passengers; now the officers and crew are the agents of navigation; the ship is an instrument of it; and the cargo on board is the subject of commerce: and yet it is not only admitted, that this power remains with the states, but the laws of the United States expressly sanction the quarantines, and other restraints which *shall be required and established by the health laws of any state;* and declare that they shall be duly observed by the collectors and all other revenue officers of the United States.

We consider it unnecessary to pursue this comparison further; because we think, that if the stronger powers under the necessity of the case, by inspection laws and quarantine laws to delay the landing of a ship and cargo, which are the subjects of commerce and navigation, and to remove or even to destroy unsound and infectious articles, also the subject of commerce, can be rightfully exercised; then, that it must follow as a consequence, that powers less strong, such as the one in question, which operates upon no subject either of commerce or navigation, but which operates alone within the limits and jurisdiction of New York upon a person, at the time not even engaged in navigation, is still more clearly embraced within the general power of the states to regulate their own internal police, and to take care that no detriment come to the commonwealth.

We think it as competent and as necessary for a state to provide precautionary measures against the moral pestilence of paupers, vagabonds, and possibly convicts; as it is to guard against the physical pestilence, which may arise from unsound and infectious articles

imported, or from a ship, the crew of which may be labouring under an infectious disease.

As to any supposed conflict between this provision and certain treaties of the United States, by which reciprocity as to trade and intercourse is granted to the citizens of the governments, with which those treaties were made; it is obvious to remark, that the record does not show that any person in this case was a subject or citizen of a country to which treaty stipulation applies: but, moreover, those which we have examined, stipulate that the citizens and subjects of the contracting parties shall submit themselves to the laws, decrees, and usages to which native citizens and subjects are subjected.

We are therefore of opinion, and do direct it to be certified to the circuit court for the southern district of New York, that so much of the section of the act of the legislature of New York, as applies to the breaches assigned in the declaration, does not assume to regulate commerce between the port of New York and foreign ports; and that so much of said section is constitutional.

We express no opinion on any other part of the act of the legislature of New York; because no question could arise in the case in relation to any part of the act, except that declared upon.

Mr. Justice THOMPSON.

This case comes up from the circuit court for the southern district of New York, upon a certificate of a division of opinion of the judges upon a question which arose upon the trial of the cause.

The action is founded upon an act of the legislature of the state of New York, concerning passengers in vessels coming to the port of New York; and is brought against the defendant, being consignee of the ship Emily, to recover certain penalties given in the act for the neglect of the master of the ship to make a report to the mayor of New York, of the name and description of the passengers who had been brought in the ship on her last voyage.

The declaration sets out, in part, the law on which the action is founded; and avers, that on the 27th day of August, in the year 1829, William Thompson, being master or commander of said ship, did arrive with the said ship or vessel in the port of New York from a country out of the United States, to wit, from Liverpool in England, or from one of the United States other than this state (New York,) to wit, from the state of New Jersey, at the city and within the county of New York; and it is further averred, that one hundred

persons were brought as passengers in said ship, on her last voyage, from a country out of the United States, to wit, from Liverpool aforesaid, into the port of New York, or into one of the United States, other than the state of New York, to wit, into the state of New Jersey, and from thence to the city of New York; and that the said master of the vessel did not, within twenty-four hours after the arrival of the ship in the port of New York, make a report in writing to the mayor or recorder of the said city, of the name, place of birth, and last legal settlement, age and occupation of the said several persons so brought as passengers in said ship, pursuant to the provisions of the act, in part herein before recited; but that a large number of the said persons, to wit, one hundred, were neglected to be reported, contrary to the directions and provisions of the said act, whereby an action hath accrued to the plaintiff, to demand and have from the defendant, the consignee of the said ship, the sum of seven thousand five hundred dollars. To this declaration there is a general demurrer and joinder.

The certificate then states, that the cause was continued from term to term until the last Monday in October, in the year 1829, at which term the following point was presented on the part of the defendant, viz. That the act of the legislature of the state of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the port of New York and foreign ports; and is unconstitutional and void. And upon the question thus occurring, the opinion of the two judges were opposed; and the point upon which the disagreement happened, is certified to this Court.

Although the point as here stated is general, and might embrace the whole of the act referred to in the plaintiff's declaration; yet its validity cannot come under consideration here, any further than it applied to the question before the circuit court. The question arose upon a general demurrer to the declaration, and the certificate under which the cause is sent here contains the pleadings upon which the question arose, and show that no part of the act was drawn in question, except that which relates to the neglect of the master to report to the mayor or recorder an account of his passengers, according to the requisition of the act. No other part of the act could have been brought under the consideration of the circuit court, or could now be passed upon by this Court, was it even presented in a separate and distinct point. For this Court will not entertain any abstract question, upon a certificate of division of opinion, which does not

[City of New York v. Miln.]

arise in the cause. The question must occur before the circuit court, according to the express terms of the act of congress, in order to come here upon such division of opinion. And if the only cause of action alleged in the declaration, was the neglect of the master to report his passengers to the mayor or recorder, no other part of the act could have been drawn in question; and although the question as stated, may be broader than was necessary, yet as the declaration and demurrer are embraced in the certificate, the question in the circuit court cannot be mistaken. The certificate might have been sent back for a more specific statement of the point; but as the breach is assigned under this part of the act only, and as we see that no other part of the act could have been drawn in question in the circuit court, it is not deemed necessary to send the cause back for a more specific statement of the point. I shall accordingly confine my inquiries simply to that part of the act of the legislature of the state of New York, which requires the master, within twenty-four hours after the arrival of the vessel in the port of New York, to make a report in writing to the mayor or recorder, of the name, place of birth, and last legal settlement, age and occupation of every person who shall have been brought as a passenger in such ship or vessel on her last voyage. I do not mean, however, to intimate. that any other part of the act is unconstitutional; but confine my inquiries to the part here referred to, because it is the only part that can arise in this case. And any opinion expressed upon other parts, would be extrajudicial.

This act is alleged to be unconstitutional, on the ground that it assumes to regulate trade and commerce between the port of New York, and foreign ports; and is a violation of that part of the constitution of the United States, which gives to congress the power to regulate commerce with foreign nations.

This clause in the constitution has repeatedly been drawn in question before this Court, and has undergone elaborate discussion, both at the bar and upon the bench; and so far as any points have been settled, I do not consider them now open for examination. In the leading cases upon this question, where the state law has been held to be unconstitutional, there was an actual conflict between the legislation of congress and chat of the states, upon the right drawn in question: 9 Wheat. 195; 12 Wheat. 446; 6 Peters, 515. And in all such cases the law of congress is supreme; and the state law, though enacted in the exercise of powers not controverted, must yield to it.

[City of New York v. Miln.]

But in the case now before the Court, no such conflict arises; congress has not legislated on this subject, in any manner to affect this question. By the 23d section of the duty act of 1799, 3 vol. L. U. S. 158; it is required that the manifest shall contain the names of the several passengers, distinguishing whether cabin or steerage passengers, or both, with their baggage, specifying the number and description of packages belonging to each, respectively; but this is a mere revenue law, having no relation to the passengers after they have landed. Nor does the act regulating passenger ships and vessels, 6 vol. L. U. S. 379, at all conflict with this state law. Its principal object is to provide for the comfort and safety of passengers on the voyage; it requires the captain or master of the vessel, to deliver a list or manifest of all passengers, with the manifest of the cargo; and the collector is directed to return, quarterly, to the secretary of state, copies of such list of passengers; by whom statements of the same is required to be laid before congress, at every session: by which it is evident that some statistical or political object was in view by this provision.

It is not necessary, in this case, to fix any limits upon the legislation of congress and of the states, on this subject; or to say how far congress may, under the power to regulate commerce, control state legislation in this respect. It is enough to say that whatever the power of congress may be, it has not been exercised so as, in any manner, to conflict with the state law; and if the mere grant of the power to congress does not necessarily imply a prohibition of the states to exercise the power, until congress assumes to exercise it; no objection, on that ground, can arise to this law.

Nor is it necessary to decide, definitively, whether the provisions of this law may be considered as at all embraced within the power to regulate commerce. Under either view of the case, the law of New York, so far at least as it is drawn in question in the present suit, is entirely unobjectionable.

This law does not, in any respect, interfere with the entry of the vessel or cargo. It requires the report of the master to be made within twenty-four hours after the arrival of the vessel. In the case of Gibbons v. Ogden, 9 Wheat. 195, it is said, the genius and character of the whole government seems to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally, but not to those which are completely within a particular state, which do not affect other states.

[City of New York v. Miln.]

and with which it is not necessary to interfere for the purpose of executing some of the general powers of the government. The completely internal commerce of a state may then be considered as reserved for the state itself.

To test the present case by this rule. The duty here imposed arises after the master and passengers have arrived within the limits of the state, and is applied to the purely internal concerns of the state. This provision does not affect other states, or any subject necessary for the purpose of executing any of the general powers of the government of the Union. For although commerce, within the sense of the constitution, may mean intercourse, and the power to regulate it be co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, according to the language of this Court in the case of Brown v. The State of Maryland, 12 Wheat. 446 ; it cannot be claimed that the master, or the passengers, are exempted from any duty imposed by the laws of a state, after their arrival within its jurisdiction ; or have a right to wander, uncontrolled, after they become mixed with the general population of the state; or that any greater rights or privileges attach to them, because they come in through the medium of navigation, than if they come by land from an adjoining state: and if the state had a right to guard against paupers becoming chargeable to the city, it would seem necessarily to follow, that it had the power to prescribe the means of ascertaining who they were, and a list of their names is indispensable to effect that object. The purposes intended to be answered by this law fall within that internal police of the state; which, throughout the whole case of Gibbons v. Ogden, is admitted to remain with the states. The Court there, in speaking of inspection laws, say, they form a portion of that immense mass of legislation which embraces every thing within the territory of a state, not surrendered to the general government; all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass. No direct general power over these objects is granted to congress: and, consequently, they remain subject to state legislation. If the legislative power of the state can reach them, it must be for national purposes; it must be when the power is expressly given for a special purpose, or is clearly incidental to some power which is expressly

given. Again, in speaking of the law relative to the regulation of pilots, it is said, that when the government of the Union was brought into existence, it found a system for the regulation of its pilots in full force in every state; and that the adoption of these laws, as also the prospective legislation of the states, manifests an intention to leave this subject entirely to the states, until congress should think proper to interpose: but that the section of the law under consideration is confined to pilots within the bays, inlets, rivers, harbours, and ports of the United States, which are, of course, in whole or in part, within the limits of some particular state: and that the acknowledged power of a state to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject to a considerable extent. But that the adoption of the state system, being temporary until further legislative provision shall be made by congress; shows, conclusively, an opinion that congress could control the whole subject, and might adopt the system of the states or provide one of its own. Here seems to be a full recognition of the right of a state to legislate on a subject coming confessedly within the power to regulate commerce, until congress adopts a system of its own.

And again, in the case of Brown v. The State of Maryland, the Court. in speaking of state laws in relation to gunpowder, say; the power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains and ought to remain with the states. The state law here is brought to act directly upon the article imported, and may even prevent its landing, because it might endanger the public safety.

Can any thing fall more directly within the police power and internal regulation of a state, than that which concerns the care and management of paupers or convicts, or any other class or description of persons that may be thrown into the country, and likely to endanger its safety, or become chargeable for their maintenance? It is not intended by this remark to cast any reproach upon foreigners who may arrive in this country. But if all power to guard against these mischiefs is taken away, the safety and welfare of the community may be very much endangered.

A resolution of the old congress passed on the 16th of September, 1788, has an important bearing on this subject; 13 vol. Journals of Congress, 142. It is as follows: " Resolved, that it be and it is hereby recommended to the several states to pass proper laws for pre-

[City of New York v. Miln.]

venting the transportation of convicted malefactors from foreign countries into the United States." Although this resolution is confined to a certain description of persons; the principle involved in it must embrace every description which may be thought to endanger the safety and security of the country. But the more important bearing which this resolution has upon the question now before the Court, relates to the source of the power which is to interpose this protection. It was passed after the adoption of the constitution by the convention, which was on the 17th of September, 1787. It was moved by Mr. Baldwin, and seconded by Mr. Williamson, both distinguished members of the convention, which formed the constitution; and is a strong cotemporaneous expression, not only of their opinion, but that of congress, that this was a power resting with the states; and not only not relinquished by the states, or embraced in any powers granted to the general government, but still remains exclusively in the states.

The case of Wilson v. Blackbird Creek Marsh Company, 2 Peters, 251, is a strong case to show that a power admitted to fall within the power to regulate commerce, may be exercised by the states until congress assumes the exercise. The state law under consideration in that case, authorized the erection of a dam across a creek, up which the tide flows for some distance, and thereby abridged the right of navigation by those who had been accustomed to use it. The Court say, " The counsel for the plaintiff in error insist that it comes in conflict with the power of the United States to regulate commerce with foreign nations, and among the several states. If congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern states; we should not have much difficulty in saying, that a state law, coming in conflict with such act, would be void. But congress has passed no such act. The repugnancy of the law of Delaware to the constitution, is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several states; a power which has not been so exercised as to affect the question. We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek, can, under all the circumstances of the case, be considered as repugnant to the power to regulate com-

merce in its *dormant state;* or as being in conflict with any law passed on the subject. The state law here operated upon the navigation of waters, over which the power to regulate commerce confessedly extends; and yet the state law, not coming in conflict with any act of congress, was held not to be unconstitutional; and was not affected by the *dormant* power to regulate commerce. By the same rule of construction, the law of New York, not coming in conflict with any act of congress, is not void by reason of the *dormant power* to regulate commerce; even if it should be admitted that the subject embraced in that law fell within such power. This principle is fully recognised by the whole Court, in the case of Houston v. Moore, 5 Wheat. 1. The validity of a law of the state of Pennsylvania, relative to the militia of that state, came under the consideration of the Court; and Mr. Justice Washington, who spoke for a majority of the Court, says:—It may be admitted at once, that the militia belongs to the states respectively in which they are enrolled; and that they are subject, both in their civil and military capacities, to the jurisdiction and laws of such state, except so far as those laws are controlled by acts of congress, constitutionally made. Congress has power to provide for organizing, arming, and disciplining the militia; and it is presumable that the framers of the constitution contemplated a *full* exercise of this power. Nevertheless, if congress had declined to exercise them, it was competent for the state governments to provide for organizing, arming, and disciplining their respective militia in such manner as they may think proper. And Mr. Justice Johnson, who dissented from the Court in the result of the judgment, when speaking on this point, says:—It is contended that if the states do possess this power over the militia, they may abuse it. This, says he, is a branch of the exploded doctrine that within the scope in which congress may legislate, the states shall not legislate. That they cannot, when legislating within that wide region of p wer, run counter to the laws of congress, is denied by no one. When instances of this opposition occur, it will be time enough to meet them. And Mr. Justice Story, who also dissented from the result of the judgment, is still more full and explicit on this point. The constitution, says he, containing a grant of powers in many instances similar to those already existing in the state governments; and some of these being of vital importance also to state authority and state legislation, it is not to be admitted that a mere grant of such powers, in affirmative terms, to congress, does, *per se,* transfer an exclusive

sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion that the powers so granted are never exclusive of similar powers existing in the states; unless when the constitution has expressly, in terms, given an exclusive power to congress, or the exercise of a like power is prohibited to the states; or where there is a direct repugnancy, or incompatibility, in the exercise of it by the states. The example of the first class is to be found in the *exclusive* legislation delegated to congress over places purchased by the consent of the legislature of the state in which the same shall be, for forts, arsenals, dock-yards, &c.; of the second class, the prohibition of a state to coin money, or emit bills of credit; of the third class, as this Court has already held, the power to establish an uniform rule of naturalization, and the delegation of admiralty and maritime jurisdiction. In all other cases, not falling within the classes already mentioned, it seems unquestionable that the states retain concurrent authority with congress; not only upon the letter and spirit of the eleventh amendment of the constitution, but upon the soundest principle of reasoning. There is this reserve, however, that in cases of concurrent authority, when the laws of a state, and of the Union, are in direct and manifest collision on the same subject; those of the Union, being the supreme law of the land, are of paramount authority; and the state laws so far, and so far only as such incompatibility exists, must necessarily yield."

Whether, therefore, the law of New York, so far as it is drawn in question in this case, be considered as relating purely to the police and internal government of the state, and as part of the system of poor laws in the city of New York, and in this view belonging exclusively to the legislation of the state; or whether the subject matter of the law be considered as belonging concurrently to the state and to congress, but never having been exercised by the latter; no constitutional objection can be made to it. Although the law, as set out in the record, appears to have been recently passed, 11th February, 1824, yet a similar law has been in force in that state for nearly forty years, 1 Rev. Laws of 1801, p. 556; and from the references at the argument to the legislation of other states, especially those bordering on the Atlantic, similar laws exist in those states. To pronounce all such laws unconstitutional, would be productive of the most serious and alarming consequences; and ought not to be done,

unless demanded by the most clear and unquestioned construction of the constitution.

It has been argued at the bar, that this law violates certain treaties between the United States and foreign nations, and the treaties with Brazil, Prussia, and Austria, 8 vol. L. U. S. 910, 924, 946, have been referred to as being in conflict with it. It would be a sufficient answer to this objection, that the national character of the defendant, or of the master or vessel, do not appear upon the record accompanying the certificate, so as to enable the Court to inquire whether the law conflicts with any treaty stipulation. But there is nothing in the law, so far at all events as it relates to the present case, which is at all at variance with any of the treaties referred to. These treaties were entered into for the purpose of establishing a reciprocity of commercial intercourse between the contracting parties; but give no privileges or exemptions to the citizens or subjects of the one country over those of the other. But in some of them, particularly in the treaty with Brazil, it is expressly provided that the citizens and subjects of each of the contracting parties shall enjoy all the rights, privileges and exemptions in navigation and commerce, which native citizens or subjects do or shall enjoy; submitting themselves to the laws, decrees, and usages there established, to which native citizens or subjects are subjected. And the other treaties referred to, have substantially the same provision.

Whether the law of New York, so far as it applies to the case now before the Court, be considered as a mere police regulation, and the exercise of a power belonging exclusively to the state; or whether it be considered as legislating on a subject falling within the power to regulate commerce, but which still remains dormant, congress not having exercised any power conflicting with the law in this respect; no constitutional objection can, in my judgment, arise against it. I have chosen to consider this question under this double aspect, because I do not find, as yet laid down by this Court, any certain and defined limits to the exercise of this power to regulate commerce; or what shall be considered commerce with foreign nations, and what the regulations of domestic trade and police. And when it is denied that a state law, in requiring a list of the passengers arriving in the port of New York, from a foreign country, to be reported to the police authority of the city, is unconstitutional and void, because embraced within that power; I am at a loss to say where its limits are to be found. It becomes, therefore, a very im-

[City of New York v. Miln.]

portant principle to establish, that the states retain the exercise of powers; which, although they may in some measure partake of the character of commercial regulations, until congress asserts the exercise of the power under the grant of the power to regulate commerce.

Mr. Justice STORY, dissenting.

The present case comes before the Court upon a certificate of division of opinion of the judges of the circuit court of the southern district of New York. Of course, according to the well known practice of this Court, and the mandates of the law, we can look only to the question certified to us, and to it, in the very form, in which it is certified. In the circuit court, the following point was presented on the part of the defendant, viz: that the act of the legislature of the state of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the port of New York and foreign ports, and is unconstitutional and void. And this point constitutes the matter of division in the circuit court; and that upon which our opinion is now required.

The act of New York, here referred to, was passed on the 11th of February, 1824, and is entitled, " an act concerning passengers in vessels coming to the port of New York." By the first section it requires the master of any ship arriving at the port of New York, from any country out of the United States, or from any other of the United States, than New York, within twenty-four hours after the arrival, to make a report in writing, on oath or affirmation, to the mayor of the city, &c., of the name, place of birth, and last legal settlement, age and occupation of every passenger brought in the ship on her last voyage from any foreign country, or from any other of the United States, to the city of New York, and of all passengers landed, or suffered, or permitted to land at any place during her last voyage, or put on board, or suffered, or permitted to go on board of any other ship with an intention of proceeding to the said city, under the penalty of seventy-five dollars for every passenger not so reported, to be paid by the master, owner, or consignee. The second section makes it lawful for the mayor, &c. to require every such master to give bond, with two sufficient sureties, in a sum not exceeding three hundred dollars for each passenger, not being a citizen of the United States, to indemnify and save harmless the mayor, &c. and overseers of the poor from all expense and charge

which may be incurred for the maintenance and support of every such passenger, &c. under a penalty of five hundred dollars. The third section provides, that whenever any person brought in such ship, and *being a citizen of the United States*, shall be by the mayor, &c. deemed likely to become chargeable to the city; the master or owner shall, upon an order for this purpose, remove every such person without delay to the place of his last settlement, and in default shall be chargeable with the expenses of the maintenance and removal of such person. The fourth section requires persons not citizens, entering into the city with the intention of residing there, to make a report prescribed by the act under the penalty of one hundred dollars. The fifth section provides for the manner of recovering the penalties. The sixth section makes the ship liable to attachment and seizure for the penalties. The seventh section repeals former acts; and the eighth and last section declares persons swearing, or affirming falsely, in the premises, guilty of perjury, and punishable accordingly.

Such is the substance of the act: it is apparent, that it applies to all vessels coming from foreign ports, and to all coasting vessels and steamboats from other states, and to all foreigners, and to all citizens, who are passengers, whether they come from foreign ports or from other states. It applies also, not only to passengers who arrive at New York, but to all passengers landed in other states, or put on board of other vessels, although not within the territorial jurisdiction or limits of New York.

The questions then presented for our consideration under these circumstances are, first, whether this act assumes to regulate trade and commerce between the port of New York and foreign ports. Secondly, if it does, whether it is unconstitutional and void. The counsel for the plaintiff, assert the negative; the counsel for the defendant, maintain the affirmative on both points.

In considering the first point, we are spared even the necessity of any definition or interpretation of the words of the constitution, by which power is given to congress " to regulate commerce with foreign nations, and among the several states;" for the subject was most elaborately considered in Gibbons v. Ogden, 9 Wheat. R. 1. On that occasion, Mr. Chief Justice Marshall, in delivering the opinion of the Court, said; " commerce undoubtedly is traffic; but it is something more. It is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches;

[City of New York v. Miln.]

and is regulated by prescribing rules for carrying on that intercourse;" 9 Wheat. R. 189. And again, "these words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other, to which this power does not extend;" 9 Wheat. R. 193, 194. "In regulating commerce with foreign nations the power of congress does not stop at the jurisdictional lines of the several states. It would be a very useless power, if it could not pass those lines." "If congress has the power to regulate it, that power must be exercised, wherever the subject exists. If it exists within the states, if a foreign voyage may commence or terminate at a port within a state, then the power of congress may be exercised within a state;" 9 Wheat. R. 195. "The power of congress then comprehends navigation within the limits of every state in the Union, so far as that navigation may be connected with commerce, with foreign nations, or among the several states;" 9 Wheat. R. 197. And again, "It is the power to regulate, that is, to prescribe the rule, by which commerce is governed;" 9 Wheat. R. 196. But what is most important to the point now under consideration, it was expressly denied in that case, that vessels engaged in carrying passengers were as much within the constitutional power of congress to regulate commerce, as vessels engaged in the transportation of goods. "Vessels (said the Chief Justice) have always been employed to a greater or less extent in the transportation of passengers, and have never been supposed to be on that account withdrawn from the control or protection of congress. Packets, which ply along the coast, as well as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it has never been suspected that the general laws of navigation did not apply to them." And again, "a coasting vessel employed in the transportation of passengers, is as much a portion of the American marine, as one employed in the transportation of a cargo;" 9 Wheat. R. 215, 216. And this language is the more impressive, because the case, then before the Court, was that of a steamboat, whose principal business was the transportation of passengers. If then the regulation of passenger ships, be in truth a regulation of trade and commerce, it seems very difficult to escape from the conclusion, that the act in controversy is, in the sense of the objection, an act which assumes to regulate trade and commerce between the port of New York and foreign parts. It requires a

report, not only of passengers who arrive at New York, but of all who have been landed at any places out of the territorial limits of New York, whether in foreign ports or in the ports of other states. It requires bonds to be given by the master or owner for all passengers not citizens; and it compels them to remove, or pay the expenses of removal of all passengers, who are citizens, and are deemed likely to become chargeable to the city, under severe penalties. If these enactments had been contained in any act passed by congress, it would not have been doubted that they were regulations of passenger ships engaged in foreign commerce? Is their character changed by their being found in the laws of a state?

I admit, in the most unhesitating manner, that the states have a right to pass health laws and quarantine laws, and other police laws, not contravening the laws of congress rightfully passed under their constitutional authority. I admit, that they have a right to pass poor laws, and laws to prevent the introduction of paupers into the state, under the like qualifications. I go further, and admit, that in the exercise of their legitimate authority over any particular subject, the states may generally use the same means which are used by congress, if these means are suitable to the end. But I cannot admit that the states have authority to enact laws, which act upon subjects beyond their territorial limits, or within those limits, and which trench upon the authority of congress in its power to regulate commerce. It was said by this Court in the case of Brown v. The State of Maryland, 12 Wheat 419, that even the acknowledged power of taxation by a state, cannot be so exercised as to interfere with any regulation of commerce by congress.

It has been argued, that the act of New York is not a regulation of commerce, but is a mere police law upon the subject of paupers and it has been likened to the cases of health laws, quarantine laws ballast laws, gunpowder laws, and others of a similar nature. The nature and character of these laws were fully considered, and the true answer given to them in the case of Gibbons v. Ogden, 9 Wheat. R. 1; and though the reasoning there given might be expanded, it cannot in its grounds and distinctions be more pointedly illustrated, or better expounded. I have already said that I admit the power of the states to pass such laws, and to use the proper means to effectuate the objects of them; but it is with this reserve, that these means are not exclusively vested in congress. A state cannot make a regulation of commerce to enforce its health laws, because it is a

[City of New York v. Miln.]

means withdrawn from its authority.   It may be admitted that it is a means adapted to the end; but it is quite a different question whether it be a means within the competency of the state jurisdiction.   The states have a right to borrow money; and borrowing by the issue of bills of credit, would certainly be an appropriate means: but we all know, that the emission of bills of credit by a state is expressly prohibited by the constitution.   If the power to regulate commerce be exclusive in congress, then there is no difference between an express and an implied prohibition upon the states.

But how can it be truly said, that the act of New York is not a regulation of commerce?   No one can well doubt, that if the same act had been passed by congress it would have been a regulation of commerce; and in that way, and in that only, would it be a constitutional act of congress.   The right of congress to pass such an act has been expressly conceded at the argument.   The act of New York purports on its very face to regulate the conduct of masters, and owners, and passengers, in foreign trade; and in foreign ports and places.   Suppose the act had required, that the master and owner of ships should make report of all goods taken on board or landed in foreign ports, and of the nature, qualities, and value of such goods; could there be a doubt that it would have been a regulation of commerce?   If not, in what essential respect does the requirement of a report, of the passengers taken or landed in a foreign port or place, differ from the case put?   I profess not to be able to see any.   I listened with great attention to the argument, to ascertain upon what ground the act of New York was to be maintained, not to be a regulation of commerce.   I confess that I was unable to ascertain any, from the reasoning of either of the learned counsel who spoke for the plaintiff.   Their whole argument on this point seemed to me to amount to this: that if it were a regulation of commerce, still it might also be deemed a regulation of police, and a part of the system of poor laws; and therefore justifiable as a means to attain the end.   In my judgment, for the reasons already suggested, that is not a just consequence, or a legitimate deduction.   If the act is a regulation of commerce, and that subject belongs exclusively to congress; it is a means cut off from the range of state sovereignty and state legislation.

And this leads me more distinctly to the consideration of the other point in question; and that is, whether if the act of New York be a regulation of commerce, it is void and unconstitutional?   If the power of congress to regulate commerce be an exclusive power; or

if the subject matter has been constitutionally regulated by congress, so as to exclude all additional or conflicting legislation by the states; then, and in either case, it is clear, that the act of New York is void and unconstitutional. Let us consider the question under these aspects.

It has been argued that the power of congress to regulate commerce is not exclusive, but concurrent with that of the states. If this were a new question in this Court, wholly untouched by doctrine or decision; I should not hesitate to go into a full examination of all the grounds upon which concurrent authority is attempted to be maintained. But in point of fact, the whole argument on this very question, as presented by the learned counsel on the present occasion, was presented by the learned counsel who argued the case of Gibbons v. Ogden, 9 Wheaton, R. 1; and it was then deliberately examined and deemed inadmissible by the Court. Mr. Chief Justice Marshall, with his accustomed accuracy and fulness of illustration, reviewed at that time the whole grounds of the controversy; and from that time to the present, the question has been considered (as far as I know) to be at rest. The power given to congress to regulate commerce with foreign nations, and among the states, has been deemed exclusive; from the nature and objects of the power, and the necessary implications growing out of its exercise. Full power to regulate a particular subject implies the whole power, and leaves no residuum; and a grant of the whole to one, is incompatible with a grant to another of a part. When a state proceeds to regulate commerce with foreign nations, or among the states, it is doing the very thing which congress is authorized to do ; Gibbons v. Ogden, 9 Wheat. R. 198, 199. And it has been remarked, with great cogency and accuracy, that the regulation of a subject indicates and designates the entire result; applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to leave untouched, as that upon which it has operated; Gibbons v. Ogden, 9 Wheat. R. 209.

This last suggestion is peculiarly important in the present case; for congress has, by the act of the 2d of March, 1819, ch. 170, regulated passenger ships and vessels. Subject to the regulations therein provided, passengers may be brought into the United States from foreign ports. These regulations, being all which congress have chosen to enact; amount, upon the reasoning already stated, to a com-

plete exercise of its power over the whole subject, as well in what is omitted as in what is provided for. Unless, then, we are prepared to say, that wherever congress has legislated upon this subject, clearly within its constitutional authority, and made all such regulations, as in its own judgment and discretion were deemed expedient; the states may step in and supply all other regulations, which they may deem expedient, as complementary to those of congress, thus subjecting all our trade, commerce and navigation, and intercourse with foreign nations, to the double operations of distinct and independent sovereignties; it seems to me impossible to maintain the doctrine, that the states have a concurrent jurisdiction with congress on the regulation of commerce, whether congress has or has not legislated upon the subject; but a fortiori when it has legislated.

There is another consideration, which ought not to be overlooked in discussing this subject. It is, that congress, by its legislation, has in fact authorized not only the transportation but the introduction of passengers into the country. The act of New York imposes restraints and burthens upon this right of transportation and introduction. It goes even further, and authorizes the removal of passengers under certain circumstances out of the state, and at the expense of the master and owner in whose ship they have been introduced; and this, though they are citizens of the United States, and were brought from other states. Now, if this act be constitutional to this extent, it will justify the states in regulating, controlling, and, in effect, interdicting the transportation of passengers from one state to another in steam boats and packets. They may levy a tax upon all such passengers; they may require bonds from the master that no such passengers shall become chargeable to the state; they may require such passengers to give bonds that they shall not become so chargeable; they may authorize the immediate removal of such passengers back to the place from which they came. These would be most burthensome and inconvenient regulations respecting passengers, and would entirely defeat the object of congress in licensing the trade or business. And yet, if the argument which we have heard be well founded, it is a power strictly within the authority of the states, and may be exerted at the pleasure of all or any of them, to the ruin and perhaps annihilation of our passenger navigation. It is no answer to the objection to say, that the states will have too much wisdom and prudence to exercise the authority to so great an extent. Laws were actually passed of a retaliatory nature by the states of New York, New Jersey and

[City of New York v. Miln.]

Connecticut during the steam boat controversy, which threatened the safety and security of the Union; and demonstrated the necessity, that the power to regulate commerce among the states should be exclusive in the Union, in order to prevent the most injurious restraints upon it.

In the case of Brown v. The State of Maryland, 12 Wheat. R. 419, the state had by an act required that every importer of foreign goods, selling the same by wholesale, should, before he was authorized to sell the same, take out a license for which he should pay 50 dollars; and in default, the importer was subjected to a penalty. The question was, whether the state legislature could constitutionally require the importer of foreign goods to take out such a license, before he should be permitted to sell the same in the imported package? The Court held that the act was unconstitutional and void, as laying a duty on imports, and also as interfering with the power of congress to regulate commerce. On that occasion arguments were addressed to the Court on behalf of the state of Maryland, by their learned counsel, similar to those which have been addressed to us on the present occasion; and in a particular manner the arguments that the act did not reach the property until after its arrival within the territorial limits of the state; that it did not obstruct the importation, but only the sale of goods after the importation. The Court said; " There is no difference, in effect, between the power to prohibit the sale of an article, and the power to prohibit its introduction into the country. The one would be a necessary consequence of the other. None would be imported if none could be sold." "It is obvious that the same power which imposes a light duty, can impose a heavy one, which amounts to a prohibition. Questions of power do not depend on the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed." " The power claimed by the state is, in its nature, in conflict with that given to congress (to regulate commerce); and the greater or less extent to which it may be exercised, does not enter into the inquiry concerning its existence." "Any charge on the introduction and incorporation of the articles into and with the mass of property in the country, must be hostile to the power given to congress to regulate commerce; since an essential part of that regulation and principal object of it is to prescribe the regular means of accomplishing that introduction and incorporation."

This whole reasoning is directly applicable to the present case; if

[City of New York v. Miln.]

instead of the language respecting the introduction and importation of goods, we merely substitute the words respecting the introduction and importation of passengers, we shall instantly perceive its full purpose and effect. The result of the whole reasoning is, that whatever restrains or prevents the introduction or importation of passengers or goods into the country, authorized and allowed by congress; whether in the shape of a tax or other charge, or whether before or after their arrival in port, interferes with the exclusive right of congress to regulate commerce.

Such is a brief view of the grounds upon which my judgment is, that the act of New York is unconstitutional and void. In this opinion I have the consolation to know that I had the entire concurrence, upon the same grounds, of that great constitutional jurist, the late Mr. Chief Justice Marshall. Having heard the former arguments, his deliberate opinion was, that the act of New York was unconstitutional; and that the present case fell directly within the principles established in the case of Gibbons v. Ogden, 9 Wheat. R. 1, and Brown v. The State of Maryland, 12 Wheat. R. 419.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the southern district of New York, and on the question and point on which the judges of the said circuit court were opposed in opinion, and which was certified to this Court for its opinion, agreeably to the act of congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that so much of the section of the act of the legislature of New York as applies to the breaches assigned in the declaration, does not assume to regulate commerce between the port of New York and foreign ports; and that so much of said section is constitutional. Whereupon, it is now here ordered and adjudged by this Court, that it be so certified to the said circuit court.