## MITCHELL v. STEELMAN et al.

Where A, the owner of a sea-going vessel, executes to B, a mortgage thereon, which is recorded in the custom-house of her home port, B commences suit to foreclose the mortgage, and makes C a party defendant thereto, on the ground that he has purchased the vessel, subject to the lien of plaintiff's mortgage, C, in his defence, avers that the mortgage was void under our Statute of Frauds, and that he now held the vessel discharged from the same : Held, that the mortgage was a valid lien, and that the record of the mortgage was sufficient notice thereof to C.

The power of Congress to regulate commerce, is exclusive, when exercised. The act of Congress of July 29th, 1850, authorizing mortgages of this kind to be recorded, and making the record thereof notice to third parties, being in conflict with our Statute of Frauds, the latter must yield.

Where notice of a mortgage is had by a subsequent purchaser or mortgagor, he is not protected by our Statute of Frauds.

Appeal from the Superior Court of the City of San Francisco.

The defendant Steelman, on the twelfth day of June, one thousand eight hundred and fifty-four, executed to William B. Swain his promissory note for one thousand two hundred and fifty dollars, and, to secure the payment of the same, executed to Swain a mortgage, upon the schooner Falmouth. The mortgage was duly recorded in the records of mortgages, in the custom-house, at San Francisco, and the note and mortgage were afterwards, on the thirtieth day of April, one thousand eight hundred and fifty-five, assigned by Swain to the plaintiff. The schooner was permitted, by the holder of the note and 'mortgage, to remain in the possession of Steelman, who sold his interest in the vessel to the defendant Lawrence, on the sixth of December, one thousand eight hundred and fifty-five. The plaintiff brought his action to foreclose his mortgage, and defendant Lawrence was made a party, as claiming an interest in the mortgaged property. Lawrence demurred, and answered at the same time; the demurrer was overruled, a trial had upon the merits, when judgment was rendered for plaintiff against Steelman, and a decree entered that the vessel be sold, and the defendant Lawrence appealed to this Court.

There was testimony which satisfied the Chancellor that the defendant Lawrence had purchased the interest of Steelman, in the vessel, subject to the mortgage, which he expressly promised to pay.

*Calhoun, Wise & Della Torre,* for Appellant.

This is a bill in equity, and should be judged by the rules of equity pleading, where the code does not interfere.

The only part of the complaint which contains a charge against the defendant Lawrence, is in these words :

" And plaintiff further avers, that said defendant Lawrence

has purchased the said schooner, subject to the lien of said mortgage, and now holds the same."

This is insufficient. It states a conclusion of law instead of facts, whence the conclusion is to be drawn. It admits of no mode of answer, except a general denial. The plaintiff's bill must show, by the facts it charges, that defendant is liable. This is so elementary, that citations may be made to books on pleading—*passim.* Mitford, Story's Eq. Pl.; Dan. Ch. Pr.; See Ryves *v.* Ryves, 3 Vesey, 343; Crossing *v.* Honor, 1 Term, 180; Lord Uxbridge *v.* Strucland, 1 Ves., 56; 3 Merivale, 503.

On the case made at trial, defendant Lawrence was entitled to a decree, and the bill ought to have been dismissed against him.

The Judge thinks, notice of a prior mortgage was proved against him.

But admitting the testimony of Swain, and the wisdom of statute becomes apparent. A mortgage is given of the vessel in her home port, and for over eighteen months, although she is here trading all the while, no possession is either taken, or attempted by the mortgagee.

This Court interprets our Statute of Frauds strictly. See Calderwood *v.* Abell, 4 Cal., 90, and the admirable argument of the Court.

Fitzgerald *v.* Gorham, 4 Cal., 289, does not allow even a " constructive" change of possession to be sufficient to avoid legal fraud under our statute. The change must be " actual." See Gorham *v.* Meyer, July, 1855, p. 43, covenant in• the mortgage itself cannot dispense with the necessity of possession.

It is supposed that vessels, being a peculiar species of property, ought not to be bound by this sale. It is sufficient that our State has thought fit to include them; by section eighteenth of the statute, possession must be taken. Here, the mortgage was made between citizens of California, and at the home port of the vessel while she was at the wharf at San Francisco, and she has been habitually at that port ever since.

But it is finally contended, that the mortgage having been recorded under the act of Congress of 1850, possession under our State law was dispensed with. If this be so, it can only be because the act of Congress operates a repeal of our Statute of Frauds, so far as vessels are concerned. This power in the federal government could only exist under the grant of the power to regulate commerce. It might be a grave question how far the Constitution would extend to enable Congress to repeal the law of a State in relation to the title to personalty in its own forum. But, it is considered the question does not arise in this case. It admits of an easier solution. A ship is not only an instrument of commerce, but an object of property. As an instrument of commerce, it can be regulated by Congress, as for

Mitchell v. Steelman.

instance, by the Navigation Acts. Does this prevent a State from requiring certain evidences of fair dealing in their transfer, when the question is raised in its own forum?

The act of Congress of 1850, is not conclusive nor exclusive. It only provides for mortgages being invalid in certain cases, and unless certain conditions be complied with, a State must have the clear right to superadd other conditions in its own forum, and between its own citizens. See the opinion of the Supreme Court U. S. per Barbour, J., 11 Peters, 141, etc., in city of New York v. Miln.

"The instrument of navigation, that is the vessel, when within the jurisdiction of the State, is liable by its laws, to execution."
·'The State has a right to vindicate its criminal justice against the officers, seamen, and passengers who are within its jurisdiction, and also in the administration of its civil justice, to cause process of execution to be served on the body of the very agents of navigation, and also on the instrument of navigation, under which it may be sold, because they are within its jurisdiction, and subject to its laws."

"Each of these laws depends upon the same principle for its support; and that is, that it was passed by the State of New York, by virtue of her power to enact such laws for her internal police, as it deemed best; which laws operate upon the persons and things within her territorial limits, and therefore, within her jurisdiction."

As to the right of a State to prescribe laws for title within her limits, and in her own forum, see Warren Norris v. Johnson, January, 1856, p. 98, Cal. Sup. Court.

At all events, in the case of Davidson v. Gorham, October, 1856, the Supreme Court of California held, that in order to take advantage of this very act of Congress, the complaint must set out all the facts which bring the case within the act. In the present instance this has not been done, and of course the act cannot be applied.

State can tax instruments of commerce. Nathan v. Louisiana, 8 Howard, 73.

In Davidson v. Gorham, this Court decides, that everything necessary to constitute a vessel of the United States, must appear affirmatively. The Court can never know that a vessel is a vessel of the United States; that she has been enrolled or registered; that she was mortgaged when she was enrolled or registered, and before she changed her port, and while she was the property of the same person, unless it is affirmatively pleaded and proved.

Is the law of Congress constitutional? It is claimed that Congress has the power, from the clause regulating commerce. What is the meaning of regulating commerce? Does it mean

regulating property? Is property commerce, and commerce property?

Now, it must be clear that they cannot regulate property. It is useless for us to show what it means. We may stop here. The authorities cited· by the respondent will be found not to sustain his case.

*H. B. Janes* for Respondent.

The pleadings and proofs show the vessel to have been a sea-going vessel, enrolled for the coasting trade—a vessel of the United States, at sea "most of the time." That possession was delayed after the mortgage, at request of appellant, and for his benefit. This waiver he now seeks to avail himself of to plaintiff's prejudice. This is a proceeding in equity, and is to be adjudicated as such.

Defendant Lawrence had due and legal notice of the mortgage, became a party thereto, and took the vessel subject thereto.

Our Statute of Frauds does not require that the mortgagee should take possession of a vessel upon the execution of a mortgage. The seventeenth section does not declare· a mortgage void in default of possession, but provides "that it shall not be valid against any other persons than the parties thereto." And this is qualified by section eighteen, which provides that the mortgagee shall take possession of the class of vessels, such as this is shown to be, "as soon as may be after their return to port."

Those words, "as soon as may be," have meaning determined by judicial decisions, and all the circumstances of the case are to be taken into consideration, in determining whether a mortgagee has forfeited his right to the vessel by his delay in taking possession. Joy *v.* Sears, 9 Pick., 41; Gardner *v.* Hewlan, 2 Pick.; Wheeler *v.* Sumner, 4 Mason, 185; Abbott on Shipping, mar. p. 31, and note and authorities there cited.

If, then, as to third parties generally, the time of taking possession of a mortgaged vessel is left to be determined by all the circumstances of the case, how can a Court of Equity favor a defendant who secures the delay in taking possession for his own advantage, and, after profiting by it, seeks to use it as a means of depriving a mortgagee of his just rights?

"The mortgagee, by waiving his right to possession, only takes the risk that the mortgagor will not impose upon an innocent purchaser. This is all his risk."

The policy of all maritime nations is to keep their vessels actively employed, and every inducement is held out to prevent obstacles being opposed to their active service. Benedict's Adm., p. 157, § 277, and Molloy, 308; Abbott on Shipping, mar. p. 100; Flanders on Shipping, 358; 11 Peters, 175.

Such interpretation of 'our Statute of Frauds, is not inconsistent with all the rulings cited by defendant's counsel, as to pos-

session of mortgaged chattels by mortgagee, as all such strict-
ness is expressly waived by our Statute of Frauds, as to vessels.

The mortgage of the vessel is valid and binding upon all in-
terested, without possession in the mortgagee at all. It is a
mortgage of a vessel of the United States, duly enrolled and re-
corded according to the act of Congress, A. D. 1850, regulating
the recording of mortgages, etc.

Appellant's counsel avoids the discussion of the power of the
federal government to regulate property in vessels, because he
is satisfied with an easier solution, inasmuch as the right of Con-
gress, under the Constitution, to regulate commerce, only affects
vessels as "instruments of commerce," (vehicles, I suppose is
meant,) "not in any of their incidents as property."

I admit that the power of Congress to regulate commerce
does not extend to vessels belonging wholly to the internal com-
merce of a State, and not enrolled for the coasting trade, or reg-
istered for the foreign trade.

But the same principle which excludes the general government
from interfering with vessels purely local in character, excludes
the interference of a State with enrolled vessels of the United
States, engaged in the coasting trade, or registered vessels, en-
gaged in foreign trade. It will not be disputed " that a State
cannot, in any way, interfere with vessels engaged in foreign
commerce, for the States are unknown to foreign nations. But
the power to regulate foreign commerce is given in the same
words, and the same breath, as it were, with that over the com-
merce of the States, and with the Indian tribes. Congress
shall have power to regulate commerce with foreign nations,
and among the several States, and with the Indian tribes." U.
S. Constitution, § 8; Gibbons v. Ogden, 9 Wheaton, pp. 585, 586;
3 Ed., 1851.

In the case last above cited, the subject is fully considered by
the United States Supreme Court, Chief Justice Marshall, and
Justice Johnson, delivered the opinions. The following points
are there expressly decided :

1. The power to regulate commerce as far as it extends, is
exclusively vested in Congress, and no part of it can be exer-
cised by a State.

2. The power to regulate commerce extends to every species
of commercial intercourse between the United States and for-
eign nations, and among the several States. It does not stop at
the external boundaries of a State, but it does not extend to
commerce completely internal.

3. An enrollment of a vessel confers a national character, and
entitles the vessel to be classed as a vessel of the United States,
just as registration confers a national character upon vessels
destined for ports in foreign countries.

4. Vehicles of commerce are a subject of commercial regula-

tion. In the case cited, Judge Johnson says : " Commerce, in its simplest signification, means, an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce. The subject, the vehicle, the agent, and their various operations, become the object of commercial regulation. The power to regulate commerce, granted by the Constitution to the federal government, was that power to regulate commerce which previously existed in the States. What was that power? The States were unquestionably supreme, and each possessed that power over commerce which is acknowledged to reside in every sovereign State."

Another authority upon national jurisdiction over vessels as property, is Pardessus, one of the leading writers upon commercial law. Among the general maritime incidents of a vessel to which national jurisdiction attaches, he enumerates "everything relating to the means of acquiring title to them." 1 Pardessus, Droit Com., p. 81.

To the same point is the decision " that States, as such, have no ships or vessels." 1 Wheaton, 409; Benedict's Admiralty, § 273.

The jurisdiction and laws of the United States having once attached, accompany the vessel within the limits of another sovereignty. " The Creole," Diplomatic and Official papers, pp. 85, 86; cited also in full in Flanders' Maritime Law, p. 39, § 54, note.

In this case of the Creole, which was a subject of correspondence between Mr. Webster, while Secretary of State, and Lord Ashburton, the British Minister, at Washington, the former maintains—" That the vessels of a nation are considered as parts of its territory, and that her jurisdiction and laws accompany her ships, not only over the high seas, but into ports and harbors, or wheresoever else they may be water-borne."

To make vessels dependent upon local statutes, would render them so entirely insecure, as to prevent the use of that class of securities in commercial transactions, and of consequence greatly impede, if not actually destroy commerce, which from its very nature demands, that not only the rules of navigation should be prescribed by national laws, but also all the incidents of the property conveyed, and the vessels that convey.

If a State may strip a vessel of the privileges resulting from a right granted by its enrollment, as it could do, were the power contended for conceded, it might also destroy the right itself, and the now general regulations under which a vessel may navigate the waters among the different States, would become merely local laws, changing upon the entry of the vessel into every State, and perchance, into each different port of the same State. Thus virtually destroying the coasting trade.

BURNETT, J., after stating the facts, delivered the opinion of the Court—TERRY, C. J., concurring.

The complaint alleges the execution of the note and mortgage, both of which are set out in full, and also the recording of the mortgage. There is no allegation in the complaint, that the vessel, (except a recital of that fact in the copy of the mortgage) had been enrolled, and the only allegation in reference to the defendant Lawrence was this : " And plaintiff further avers that defendant Lawrence has purchased the said brig, subject to the lien of said mortgage, and now holds the same."

It is insisted, by the defendant Lawrence, that this allegation is insufficient to show any cause of action, as against him, as it states a conclusion of law, and not of fact, in alleging that he purchased subject to the mortgage.

There is certainly much force in the argument of counsel. It is well settled that the pleadings should state *facts*. The best pleading, and the most consistent, is a simple narration of the facts necessary to constitute a cause of action. But where more facts are stated than required, it is no ground of demurrer. Mere surplusage is not a ground of demurrer, but of a motion to strike out. § 57. A defendant can *only* demur for the causes specified in section forty.

To ascertain whether an allegation be sufficient, it is always necessary to remember the *end* for which it is made. In this case, the only object of the allegation was to show a sufficient interest in Lawrence to make him a party. The object in making him a party was to settle any claim he might choose to set up to the property mortgaged. The intention was to avoid a multiplicity of suits. In cases like this, a very slight allegation is necessary. The claim of defendant must be affirmatively set forth by him in his answer. Practice Act, § 46. The plaintiff is supposed not to know the particulars of the defendant's adverse claim. All that is required of the plaintiff is, to state enough to show that the particular defendant claims an interest in the mortgaged property. In this case, if we strike out the words, " subject to the lien of the mortgage," the allegation would be sufficient for the purposes intended. As against the adverse claim of Lawrence, the position of the plaintiff was substantially that of a defendant.

But by far the most important questions arising upon the record are two, and may be stated thus : First, was the record of the mortgage sufficient notice to Lawrence ? Second, if not, was actual notice to him sufficient, under our Statute of Frauds, to defeat his purchase, as against the lien of the mortgage ?

These questions, it is thought, have never been determined by this Court, and are certainly difficult, as well as important. The seventeenth section of our Statute of Frauds, passed April 19th, 1850, Com. L., 201, provides that "no mortgage of personal

property, heretofore made, shall be valid against any other person than the parties thereto, unless possession of the mortgaged property be delivered to, and retained by, the mortgagee." The next section makes an exception in favor of contracts of bottomry, respondentia, and assignments, and hypothecations of vessels or goods at sea, or in foreign States, or without this State; provided, the assignee or mortgagee shall take possession of such vessel or goods, as soon as may be after the arrival thereof within this State.

The first section of the act of Congress passed July 29th, 1850, United States Statutes at Large, vol. 9, p. 440, provides that no bill of sale, mortgage, hypothecation, or conveyance of any vessel, or part of any vessel, of the United States, shall be valid against any person, other than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof, unless such bill of sale, mortgage, hypothecation, or conveyance, be recorded in the office of the collector of the customs, where such vessel is registered or enrolled.

Among the powers conferred upon Congress, by the eighth section of the first article of the Constitution is, the power " to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

The first inquiry arising under the first question is, whether the provisions of our statute and those of the act of Congress, are necessarily in conflict. It is insisted by the learned counsel for the defendant, that there is no necessary conflict, and that, therefore, the provisions of both may stand. It is also substantially contended, that conceding there is a necessary conflict, the provision of our statute should stand, as it only assumes to *regulate* the *evidence* of *title* to the *vessel*, and not the manner of its employment; and that the subject of title to a vessel regularly enrolled and licensed, either for foreign or coasting trade, is a matter legitimately within the control of the several States, and not within the power of Congress.

It will be seen, that the act of Congress and our statute relate precisely to the same thing, and that these provisions are *different* in their character. To give effect to both, we must carry out the intention of each. If the clear intention of *both* acts can be fully carried out, and practically applied, then there is no necessary conflict; but if the intention of both cannot be fully carried out, then there must be a necessary conflict, and one or the other must yield.

The provisions of both acts, relate to the validity of the *same* instruments as against the *same* parties. To make the instrument valid, the act of Congress requires it to be recorded, while our statute requires actual possession to be taken of the property itself. The *entire* right of the party to the same description of

property, depends, in the contemplation of each act, *solely* and *exclusively* upon that which it *alone prescribes*.

If, then, Congress intended to give a party certain perfect rights, upon the performance of certain specified conditions, can the act of the Legislature require the party to do *more* without abridging his already perfected rights. And if these perfected rights are abridged by the statute, is it not substantially in conflict with the act of Congress? The act of Congress intended to accomplish a given *end*, by the use of specified *means*, and that end is defeated by the statute, when it requires *other* means to be used to attain the same end. The act of Congress expressly makes the record of the instrument full notice as to third parties; while the statute says it is not such notice. And if we carry out the provisions of our statute, and give them full force, then the record of the instrument accomplishes nothing, and the provision of the act of Congress is practically idle. It accomplishes no end, and a compliance with it, gives the party no rights. As both acts relate to the subject of notice to third parties, and as the provisions of each are different, and make the same rights of the party depend upon a compliance with these different provisions, the two are necessarily in conflict, and both cannot stand. And this case is not like the power to tax the same property, existing at the same time, in the State and Federal Government. Taxation, as existing in these different governments, is the right to take different portions for different purposes of the same divisible mass; and the taking of one portion, by one government, for one purpose, is not in conflict with the taking of another portion by the other, for a different purpose. If each had the right to take the whole, and each attempted to exercise this right in full, then there would be a necessary conflict, and the exclusive right in both could not exist. So, in this case, Congress and the Legislature have both assumed to declare *all* that shall constitute notice to third parties, and as they differ, there must, of necessity, be a conflict.

If, then, it be true, that there is a necessary conflict, which act is paramount? And the solution of this question depends upon the construction of that clause of the Constitution of the United States, which gives Congress the power to regulate commerce.

In the great case of Gibbons *v.* Ogden, 9 Wheaton, this clause received a most thorough examination. In that case, it was held, that the power to regulate commerce is general and exclusive, and no part of it can be exercised by a State. But when this power has not been exercised by Congress, but lies dormant, and a State, in the meantime, exercises such power over a given subject, the question, whether the action of the State be void in such a case, was left in doubt, as it did not necessarily arise. But in the subsequent cases of Wilson and others, *v.* The Black-

bird Creek Marsh Company, 2 Peters, 243, and The City of New York *v.* Miln, 11 Peters, 102, it was held, that such action of a State, would be valid, until the dormant power of Congress should be exercised. From these authorities it would follow, that the statute of this State was valid, whether the power rightfully belongs to Congress or not, until the passage of the act of July, 1850. In all these cases, it was held, that, when Congress acts, the statute of the State must yield, where the two conflict. " In every such case," says Chief Justice Marshall, " the act of Congress or the treaty is supreme; and the law. of the State, though enacted in the exercise of powers *not controverted*, must yield to it."

The only remaining inquiry arising under the first question is, whether this provision of the act of Congress, is within the power to regulate commerce. This power to regulate is the power " to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself; may be exercised to its utmost extent, and acknowledges no limitations, other than those prescribed in the Constitution." 9 Wheaton, 196.

The power of Congress to regulate commerce being general and exclusive, *when exercised*, it becomes important to know what commerce is, and what means may be used by Congress to attain the ends contemplated. When power to attain a certain end is given, and no restriction, express or implied, is imposed; the choice of the means necessary and appropriate to the end, must rest with the agent upon whom the power is conferred; and the right to use such means is of course implied. And in this case it is conceived, the inquiry regards the fact whether the right to regulate the *evidence* of title to the vehicle of commerce, is a necessary means to carry out efficiently in practice the power to regulate commerce itself. If it be a means substantial and immediate, and not contingent and remote, it would seem clear that Congress had the right to pass the act in question.

" Commerce," says Chief Justice Marshall, " undoubtedly is traffic, but it is something more; it is intercourse. It is the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribed rules for carrying on that intercourse." 9 Wheaton, 189. " Commerce," says Mr. Justice Johnson, " in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation. Ship-building, the carrying trade, and propagation of seamen, are such vital agents of commercial prosperity, that the nation which could not legislate

Mitchell *v.* Steelman.

over these subjects, would not possess power to regulate commerce." 9 Wheaton, 230. And the same learned Judge held, that the power conferred upon Congress to regulate commerce, " was not that power to regulate commerce which previously existed in the States." It was admitted by all counsel in that case, that "*unaffected by a state of war, by treaties, or by municipal regulations, all commerce among independent States was legitimate.*.

In the same case, Justice Johnson uses this forcible and clear language:

"The power of a sovereign State over commerce, therefore, amounts to nothing more than a power to limit and restrain it at pleasure. And since the power to prescribe the limits to its freedom, necessarily implies the power to determine what shall remain unrestrained, it follows that the power must be exclusive —it can reside but in one potentate."

The rights of migration and of commerce are founded upon natural law, and they cannot be rightfully restrained, except when such restraint is necessary for the good of society. Men have the right to buy and sell, export and import, all commodities they please, unless restrained by some positive law. And as to the question when, how far, and in what manner they should be restrained, the law-making power must determine.

The legislation of Congress, under this grant of power to regulate commerce, has uniformly proceeded upon the idea that the vehicles of commerce were but agents of trade, and the right to regulate them was included in the right to regulate the end for which they were used. Acts have been passed in reference to the enrollment and licensing of vessels engaged in commerce, either with foreign nations, or among the States. The power of Congress to regulate commerce, is just as great in the one case as in the other, for the reason that the Constitution confers it equally in both cases, without restriction.

If, then, Congress can pass laws regulating the contracts of seamen, the form, capacity, and size of vessels, the number of passengers in proportion to tonnage, and other matters concerning these vehicles of trade, could not Congress equally regulate the manner in which a sale or a mortgage should be made and recorded. If Congress has the right in one case, it is difficult to say the right does not exist in the other. The only plain and intelligible rule would seem to be, that the power of Congress to regulate commerce extends to all the immediate agents and vehicles of commerce; and as it extends to these vehicles for some purposes, it must for all. The power to prescribe the manner in which these vehicles may be sold or mortgaged, may, in its exercise vitally affect commerce itself. If the power of selling or mortgaging these vehicles of commerce, be improperly restrained, commerce itself must be immediately affected. The

provisions of the seventeenth and eighteenth sections of our statute, afford a good illustration.

To require the mortgagee, in all cases, to take possession of the vessel is a harsh provision, and must operate greatly in restraint of commerce. How the master of a vessel, who is a part owner, could execute a mortgage, and still remain on board, under the stringent provisions of our statute, it is difficult to see. By requiring every one who lends money to a vessel to take and keep possession of the property, the right and opportunity to raise means are greatly abridged. Few persons would be willing to aid a vessel on such terms. The provisions of the act of Congress are far more reasonable and beneficial, and equally just and safe for all parties concerned. The record system is as applicable to vessels navigating the ocean, as to lands situated within the limits of a State.

It must be conceded that commerce with foreign nations and among the States, requires uniform and fixed laws and usages. Persons engaged in this pursuit learn law from experience and information. There is, therefore, a fitness, and even necessity in giving this power to Congress.

"If there was any one object riding over every other in the adoption of the Constitution," says Mr. Justice Johnson, "it was to keep the commercial intercourse among the States free from all invidious and partial restraints." 9 Wheaton, 231.

The act of Congress has established a uniform, plain, practical and secure rule, for the sale and mortgage of vessels; and this regulation leaves the owners of these vehicles of commerce, and all persons dealing with them, the means of protection without injury to either party. But if these vessels are still subject to the laws of the different States, *after* Congress has legislated upon the subject, then there can be no certain and uniform rule. From the rapid extension and increasing importance of our commerce, these provisions of the act of Congress become indispensable.

Another very strong reason to support this provision of the act of Congress, is to be found in the fact, that the federal government can only protect the rights of vessels navigating the ocean.

Mr. Webster, in his letter to Lord Ashburton, with reference to the case of the "Creole," laid down the doctrine substantially, that the vessels of a nation, are considered as parts of its territory, and that her jurisdiction and laws accompanying her ships, not only over the high seas, but into ports and harbors, or *wherever else* they may be water-borne. Cited in Flanders on Maritime Law, § 54, note 1.

Vessels completely engaged in the internal commerce of a State, and that never go beyond its limits, are admitted to be within the exclusive jurisdiction of the State. (9 Wheaton, 194.)

Mitchell *v.* Steelman.

But vessels engaged in commerce with foreign nations, or among the several States, constitute a peculiar class of property, and the jurisdiction of the national government accompanies them wherever they may go. Under our peculiar system the federal government can only negotiate with foreign nations, and can only be responsible to them for injuries to their commerce. It is therefore, necessary that Congress should have entire power over all vehicles of commerce in such cases.

If these views be correct, the record of the mortgage was sufficient notice to the defendant Lawrence. But conceding, for the sake of argument solely, that they are not, we will proceed to consider the second question.

In reference to conveyances of real estate and the sale of personal property, the contract in both cases is valid as between the parties, without a record in the first or a change of possession in the second instance. But in regard to third parties, to make the contract good as against them, the deed must be recorded in the one case, and the possession of the personal property changed in the other. The object contemplated by the law in both cases, is the protection of others against fraud. This is accomplished by giving *notice* of the deed or sale; and this notice is given in one case by the record, and in the other by a change of possession.

In reference to conveyances of land, as the object of recording the deed is to give notice to subsequent purchasers, it has always been held that although the deed was not in fact recorded, yet if the subsequent purchaser took with actual notice, he was not injured, and the first deed must stand. As the end contemplated by the law had been attained, the intent of the law had been fulfilled, and the protection designed by it accomplished. The recording statute only protects the subsequent purchaser in good faith.

It would seem that the same rule must apply to the sale of personal property, where the seller retains possession, and the subsequent purchaser takes with actual notice. The fifteenth section of our Statute of Frauds only makes the sale of personal property without a change of possession, "conclusive evidence of fraud as against subsequent purchasers in *good faith.*" To make such a sale void as against a subsequent purchaser, he must purchase in the same "good faith," as a subsequent purchaser of real estate. If, therefore, he has actual notice, he cannot be a purchaser in good faith in the one case any more than in the other. The language of the statute is the same in both cases, and must receive the same construction. And the reason and justice of the rule are the same in both cases.

In reference to *mortgages* of personal property, the language of the seventeenth section of our Statute of Frauds, is in a different form, and does not contain the expression "subsequent

purchaser in good faith." It will be perceived that it is positive, and without condition or qualification, that "no mortgage shall be valid against any other person than the parties thereto, unless the mortgaged property be delivered to and retained by the mortgagee." .

If this provision stood alone, without any connection with other provisions in the same act, it would show an intention on the part of the Legislature to make a distinction between the case of a *sale* and a *mortgage* of personal property. And if we give this seventeenth section a literal construction, a change of possession in the case of a mortgage of personal property would be indispensable to the validity of the mortgage as against third parties. But it would seem from the scope and purpose of the Statute of Frauds, as well as of the statute concerning conveyances, that this could not have been the intention of the Legislature. There is no good reason, it is conceived, why a subsequent *purchaser* of real or personal estate, with notice, should not be permitted to defeat the prior sale, and yet a subsequent mortgagee be allowed to do so. The mortgagee has certainly no greater claim than the purchaser. The law should protect, or defeat, both alike. They are both equally innocent without notice, and equally guilty with it. And, in both cases, the man who takes with actual notice, and therefore, with the deliberate intent to defraud others, should never be sustained in a Court of Justice. The object of the law in all cases is the protection of the innocent, and not the reward of the guilty. He who takes a second conveyance or mortgage with actual notice of the first, deliberately aids and abets the fraudulent grantor or mortgagor in the attempted commission of a fraud, and should justly suffer the consequences.

In this case the proof of notice was sufficient, and the finding of the Court below correct. For these reasons, I think the judgment of the Court below should be affirmed.